# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 11, 2001 Session

## STATE OF TENNESSEE v. THOMAS DEE HUSKEY

**Appeal from the Criminal Court for Knox County**
**No. 51903     Richard Baumgartner, Judge**

---

**No. E1999-00524-CCA-R3-CD**
**August 13, 2001**

---

The defendant, Thomas Dee Huskey, brings this interlocutory appeal, contending that the double jeopardy protections of the United States and Tennessee Constitutions bar a retrial following the jury's deadlock on four counts of first degree murder. He argues that the trial court failed to declare a mistrial and manifest necessity did not compel one, that prosecutorial misconduct and judicial overreaching precipitated the jury's inability to reach a verdict, and that the trial court erroneously failed to accept the jury's special verdicts. We conclude that double jeopardy does not bar a retrial.

**Tenn. R. App. P. 9 Appeal; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Herbert S. Moncier and Gregory P. Isaacs, Knoxville, Tennessee, for the appellant, Thomas Dee Huskey.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Erik W. Daab, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Jennifer Welch, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was charged with four counts of first degree murder, following the discovery of the victims' bodies in a wooded area near Cahaba Lane in Knox County. The defendant pleaded not guilty and not guilty by reason of insanity to all four counts. On the fifth day of deliberations, the jury sent the trial court a note stating that it was unable to arrive at a unanimous decision. The trial court recalled the jury, asked if further deliberations would be beneficial, and then discharged the jury upon receiving a negative response. This court's order granting the defendant permission to appeal limited the issues for review to whether the Double Jeopardy Clause bars a retrial of the case

because:

> (1) the trial court dismissed the jury after the appellant had been placed in jeopardy without declaring a mistrial;

> (2) there was no "manifest necessity" to discharge the jury on the issue of the appellant's factual guilt of each offense; and

> (3) the jury's inability to reach a verdict was precipitated by prosecutorial misconduct or judicial misconduct during the course of the trial itself.

The defendant contends that federal and state constitutional prohibitions against double jeopardy prevent retrial, arguing that:

> (1) the jury's notes on February 12 and 13, 1999, place the defendant in jeopardy with regard to the act of killing;

> (2) manifest necessity did not require the trial court to release the jury before accepting its partial verdict on the issue of the act of killing;

> (3) the trial court's improper comments to the jury made it impossible for the court to determine that manifest necessity existed;

> (4) the trial court denied him due process, including the right to be heard, before it discharged the jury;

> (5) prosecutorial misconduct and judicial overreaching resulted in the jury's inability to reach a verdict and caused jeopardy to attach;

> (6) the trial court erroneously failed to take the jury's special verdicts on factual guilt or the degree of homicide; and

> (7) double jeopardy, res judicata, and collateral estoppel prohibit retrial of the issue of whether he suffered from a mental disease or defect because the jury rendered a special verdict as to that issue.

Because double jeopardy does not bar retrial of the defendant on the four counts of first degree murder, we affirm the trial court's denial of his motion to bar retrial.

## I. DISCHARGE OF JURY

We first address the defendant's contentions relating to whether the trial court properly declared a mistrial following the jury's announcement that it could not reach a unanimous decision.

2

The defendant argues that although jeopardy had attached, the trial court released the jury without declaring a mistrial; that no manifest necessity existed to discharge the jury without taking its partial verdicts; and that the trial court's improper comments to the jury made it impossible for a meaningful manifest necessity determination to be had. Finally, he claims that the trial court denied him due process when it discharged the jury without conferring with counsel or allowing him an opportunity to be heard. The state contends that manifest necessity existed due to the jury's inability to reach a verdict and that all of the parties knew that the trial court was going to and did declare a mistrial when it called the jury into the courtroom, following the jury's February 13 note.

Because of the nature of the defendant's contentions, we review the events surrounding the discharge of the jury in some detail. The jury began deliberating on the morning of February 9, 1999. On February 12, the jury sent the court a note, which read:

> Your Honor:
> We are unable to come to a unanimous decision on mental responsibility. People's decisions are unlikely to change.
> > Leslie Boone
> > Foreman

> We can agree that he has a mental disease or defect, but we cannot decide on the second part on p. 18 # 2 & 3. Can you give us some guidance?

With the jury out, the trial court noted that the jury was referring to the second portion of the insanity instruction relating to the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The defendant requested a mistrial, arguing that the jury was irrevocably hung. The court reread the note to defense counsel, who conferred and then repeated the request for a mistrial, arguing that the jury had deliberated for four days and that the note was not asking for clarification. The court stated that it viewed the jury to be asking for clarification and commented that it was amazed that the defendant did not want the jury to deliberate further on the issue. The court stated its intention to give the jury further instructions on insanity and to allow the jury to deliberate longer.

The following morning, February 13, the court instructed the jury as follows:

> Tennessee Code Annotated 39-11-501 provides as follows: Insanity. Insanity is a defense to prosecution if at the time of such conduct as a result of a mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law. As used in this section, mental disease or defect does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

> Therefore, Mr. Huskey would not be legally responsible for his criminal conduct if at the time of such conduct, as the result of a mental disease or defect, Mr.

3

Huskey lacked the substantial capacity to either appreciate the wrongfulness of his

conduct or conform his conduct to the requirements of the law he is charged with violating.

The court returned the jury to its deliberations. The defendant renewed his objection to the new instruction and moved for a mistrial.

Just over two hours later, the jury sent the court another note, stating "We have deliberated at length and we cannot reach a unanimous decision." The court observed that the note was not a question, and the following discussion occurred:

The Court: I am going to ask them about that. I think clearly, they have deliberated for four and a half days. I just don't see how you can ask a jury to do any more than they have done. I am going to ask them the perfunctory question of whether or not they feel any deliberations would be of any benefit, but I am certainly not going to push them at this point.

I know that they have worked hard, and I know that they have tried to resolve their differences, and it is clear that they are unable to do that. Do you want me to inquire as to the split?

[Defense Counsel]: No, sir.

[Prosecutor]: Yes, sir.

[Defense Counsel]: We would move for a mistrial.

[Prosecutor]: Well, of course, that would be after a mistrial had been declared.

[Defense Counsel]: After you declare a mistrial –

[Prosecutor]: Oh, yes. It would be improper to ask –

[Defense Counsel]: Yes.

[Prosecutor]: – before a judge made a ruling on the mistrial motion. And we would ask for –

[Defense Counsel]: But you would not ask which way it goes.

The Court: Yes.

4

[Prosecutor]: You just ask the numerical split?

The Court: I was going to ask both.

[Defense Counsel]: Well, don't ask the second question, Judge. I think, under the law, you don't.

[Defense Co-Counsel]: I think you can ask what the split is, but not –

[Defense Counsel]: You can ask the split, but not which way.

[Prosecutor]: Well, after you mistrial it, you can do anything you want to do.

The Court: Yes, well, that is the point. I mean, once it is over, I think you can inquire as to either one.

[Defense Counsel]: No, the reason you don't do that, Judge, is because it influences future jurors. It is information in the public –

The court agreed to ask the jury only about its numerical split.

Upon the jury's return to the courtroom, the following transpired:

The Court: Ladies and gentlemen, I received your latest communication – and I can tell you that I was not shocked to receive it – which reads that, "We have deliberated at length and cannot reach a unanimous decision." I know that you have been working for four and a half days. I know that you have been working very hard, and I am going to ask this question, because I feel compelled to do it: Do you think, if given further opportunity to discuss the merits of this case, that you could resolve your differences, ladies and gentlemen?

The Foreperson: (Shaking head in the negative)

The Court: Does anybody feel that you can?

Juror No. 12: No.

The Court: Ms. Bunch, it is not going to happen?

Juror No. 12: We did take a poll. We did, very nicely, go around the table, and honestly expressed ourselves.

The Court: All right. Well, that happens sometimes. Obviously, we would have

5

preferred to have a verdict. I know that you have worked long and hard on it. You can imagine, we have worked long and hard on it. But you are to be commended for the time and effort that you have put into this case. We all observed you during the course of the trial and are aware of the fact that you listened very intently, and obviously took your job very seriously.

> I am going to release you, ladies and gentlemen.

The court proceeded to instruct the jurors not to talk about the case until they had been contacted by the court and thanked the jurors for their service. Just before the jurors left the courtroom, the court asked:

> Oh, let me make one inquiry. I don't want to know which way. In other words, I don't want to know – but I want to know the numerical split. Okay? In other words, was it six to six? Was it eight to four? Was it nine to three? Can you give me a numerical split?

> Juror No. 11: Six to six, but it was on the mental responsibility part, not the guilt.

After the jury left, defense counsel discussed the schedule for filing a motion for a judgment of acquittal, stating that he had thirty days in which to file a motion for a judgment of acquittal on a mistrial.

In its order denying the defendant's motion to bar retrial, the trial court found that after substantial time and effort, the jury was unable to reach a verdict on the defendant's sanity. It found that the defendant requested a mistrial during jury deliberations and, thus, was barred from benefitting from an action that he requested. It found that manifest necessity justified a mistrial in the defendant's case.

## A. Jeopardy

The Double Jeopardy Clause of each of the United States and Tennessee Constitutions states that no person shall be put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969); State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996). In a jury trial, jeopardy attaches when the jury is sworn. See State v. Knight, 616 S.W.2d 593, 595 (Tenn.1981). The defendant contends, and we agree, that at the time the jury was discharged, jeopardy had attached in his case.

Once jeopardy attaches, a defendant has a valued interest in having the particular jury selected for trial render a verdict. United States v. Jorn, 400 U.S. 486, 485, 91 S. Ct. 547, 557 (1971). The

6

policy behind limiting the state to a single proceeding is the recognition that:

> the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Green v. United States, 355 U.S. 184, 187-88, 78 S. Ct. 221, 223 (1957). Although the Double Jeopardy Clause protects the defendant, "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." Wade v. Hunter, 336 U.S. 684, 688-89, 69 S. Ct. 834, 836-37 (1949).

Generally, once jeopardy has attached, double jeopardy will not bar a retrial if the defendant assents to the trial court ending the proceedings. State v. Mounce, 859 S.W.2d 319, 321 (Tenn. 1993). In such case, the defendant has elected to waive a verdict by that particular jury. Id.; Knight, 616 S.W.2d at 596. Double jeopardy also does not preclude retrial if manifest necessity exists for the trial court to declare a mistrial. Mounce, 859 S.W.2d at 321. This is true even if the defendant does not consent to the mistrial or, in fact, objects to the mistrial. Id. The decision to grant a mistrial lies within the trial court's discretion, and we defer to the trial court's decision absent an abuse of discretion. Id. at 322.

## B. Mistrial

Initially, the defendant argues that the trial court released the jury without declaring a mistrial. The state contends that although the trial court did not expressly state that it was declaring a mistrial, the defendant requested a mistrial, all parties understood that the trial court was declaring a mistrial, and the defendant did not object to the discharge of the jury. In arguing that the defendant requested a mistrial, the state points to the defendant's request for a mistrial following the jury's February 12 note and again following the court's supplemental insanity instruction the next morning. The defendant argues that the general rule that a mistrial upon defense motion does not bar retrial does not apply when the defendant moves for a mistrial but that motion does not relate to the actions of the court that resulted in the termination of the proceedings.

First, we note that the defendant requested a mistrial following the jury's February 12 note, believing it revealed that the jury was hopelessly deadlocked. After the court's supplemental instruction and two additional hours of deliberation, the jury reported that it could not reach a unanimous decision. Thus, we question whether the defendant's earlier requests for a mistrial were for a different reason from that which caused the trial court to release the jury. In any event, the record reflects that following the court's receipt of the February 13 note, defense counsel again requested a mistrial:

7

The Court: . . . . Do you want me to inquire as to the split?

[Defense Counsel]: No, sir.

[Prosecutor]: Yes, sir.

[Defense Counsel]: <u>We would move for a mistrial.</u>

[Prosecutor]: Well, of course, that would be after a mistrial had been declared.

[Defense Counsel]: After you declare a mistrial –

[Prosecutor]: Oh, yes. It would be improper to ask –

[Defense Counsel]: Yes.

[Prosecutor]: – before a judge made a ruling on the mistrial motion.

(Emphasis added). The discussions preceding and following the jury's release reveal that all parties understood that the trial court was going to and did declare a mistrial. Generally, when the defendant requests or consents to a mistrial, double jeopardy protections do not bar retrial. <u>Knight</u>, 616 S.W.2d at 596. "In such a case, the defendant has deliberately elected to forego his right to have guilt or innocence determined by the first trier of fact." <u>Id.</u>

Furthermore, even when the trial court lacks manifest necessity to declare a mistrial, the defendant's consent to the mistrial permits retrial. <u>Mounce</u>, 859 S.W.2d at 322. In <u>Mounce</u>, our supreme court held that consent may be inferred from the defendant's failure to object to the mistrial if the defendant has an opportunity to object:

> [T]he rationale for requiring an objection to a mistake is that it gives the trial judge an opportunity to cure a situation that one or both parties perceive to be in error. A party ought not be permitted to stand silently by while the trial court commits an error in procedure, and then later rely on that error when it is to his advantage to do so. This is why there is precedent dating back to the last century holding that if an accused fails to object to the jury's discharge upon a defective verdict, he is viewed as having waived the right not to be put on trial again. <u>State v. Ragsdale</u>, 78 Tenn. 671, 672 (1882); <u>see also</u>, <u>Waddle v. State</u>, 112 Tenn. 556, 82 S.W. 827 (1904) (absence of an objection to the discharge of the jury equates to a waiver). We thus hold that when a defendant chooses not to object to the mistrial and give the trial court an opportunity to correct the error, consent may be inferred and, therefore, double jeopardy will not bar a subsequent prosecution.

<u>Id.</u> at 323. In the present case, despite the discussion regarding polling the jury following a mistrial,

8

the defendant lodged no objection to the jury's release.  Because we conclude that the defendant

consented to the mistrial, double jeopardy does not bar a retrial regardless of the presence or absence of manifest necessity.

## C.  Due Process

The defendant argues that the trial court denied him due process when it discharged the jury without conferring with counsel or allowing him an opportunity to be heard.  We believe the record belies this contention.  Following its receipt of the February 13 note, the trial court read the note to the parties and then expressed its view that the jury had deliberated for four and one-half days and was unable to agree.  The ensuing discussion reveals that the parties knew that the trial court intended to declare a mistrial.  The defendant failed to take this opportunity to object to the jury's release and, in fact, requested a mistrial during the discussion.  After the trial court discharged the jury, the defendant participated in a discussion regarding the schedule for filing his motion for a judgment of acquittal following a mistrial.  The defendant had an opportunity to be heard on the jury's discharge but chose to make no objection.  His due process rights were not violated.

## II.  PROSECUTORIAL MISCONDUCT AND JUDICIAL OVERREACHING

The defendant contends that numerous instances of prosecutorial misconduct and judicial overreaching caused the jury to be unable to reach a verdict in this case and, thus, double jeopardy bars a retrial.  He argues that bad faith conduct on the part of the prosecutor or the trial court, which results in a mistrial, prevents retrial.  He asserts that in addition to the specific examples of overreaching in this case, the totality of the overreaching – including conduct, tactics and proceedings that predate the 1999 homicide trial – precipitated the jury's inability to reach a verdict on his sanity or to announce its verdict on guilt.  The state contends that overreaching alone does not bar retrial but, instead, that the prosecutor must intend to goad the defendant into seeking a mistrial.  It argues that the defendant does not even allege that the prosecutor or the court intended to goad the jury into the inability to reach a verdict.  Finally, it maintains that none of the instances mentioned by the defendant can be considered misconduct or overreaching on the part of the state or the trial court.

As noted above, double jeopardy does not bar a retrial when the defendant asks for a mistrial. Oregon v. Kennedy, 456 U.S. 667, 672, 102 S. Ct. 2083, 2088 (1982); Mounce, 859 S.W.2d at 321. A narrow exception to this rule exists: "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Kennedy, 456 U.S. at 676, 102 S. Ct. at 2089.  In Kennedy, the Supreme Court noted the possible confusion stemming from language in other cases which indicated that bad faith or harassment by the prosecutor or the trial court would be sufficient to invoke this exception. Id. at 674, 678 n.8, 102 S. Ct. at 2088-89, 2090 n.8.  The Court rejected these standards in favor of intent, finding them unmanageable because the rational prosecutor is always seeking to "'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt." Id. at 674, 102 S. Ct. 2089.  "Prosecutorial conduct

that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on

defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." Id. at 675-76, 102 S. Ct. 2089.

Tennessee has expressly adopted the Kennedy standard under article I, section 10 of the Tennessee Constitution for determining whether prosecutorial misconduct will bar a retrial. State v. Tucker, 728 S.W.2d 27, 31 (Tenn. Crim. App. 1986). "Only when it is shown that the prosecutor is 'goading' the defense into moving for a mistrial will double jeopardy bar a retrial." Id. In order to determine the prosecutor's intent, the trial court should look to the circumstances surrounding the prosecutor at the time:

> When things are going well, the prosecutor will seldom want to provoke a mistrial. However, when the case is collapsing around the prosecutor because the witnesses are weaker than expected, adverse rulings have kept out important evidence, or key witnesses cannot be found or did not appear, the trial judge can infer the prosecutor's intent and reach the conclusion that a mistrial was actually desired. The prosecutor's explanation of his intent may be given some credence "in light of the minimum requirements expected of all lawyers."

Id. (quoting Pool v. Superior Court, 677 P.2d 261, 272 (Ariz. 1984)). The trial court's factual findings in this regard are decisive on appeal unless the evidence preponderates otherwise. State v. Nixon, 669 S.W.2d 679, 681 (Tenn. Crim. App. 1983). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Id.

The defendant relies upon State v. Love, 597 F.2d 81 (6th Cir. 1979), and State v. Enoch, 650 F.2d 115 (6th Cir. 1981), to argue that bad faith conduct or overreaching by the prosecutor or the trial court is sufficient to bar a retrial based upon double jeopardy principles. Initially, we note that both of these cases were decided before the Supreme Court's decision in Kennedy. In Kennedy, the Court noted that language in United States v. Dintz, 424 U.S. 600, 96 S. Ct. 1075 (1976), and United States v. Jorn, 400 U.S. 470, 91 S. Ct. 547 (1971), could be construed to mean that overreaching itself would activate the double jeopardy bar to retrial. 456 U.S. at 674, 678 n.8, 102 S. Ct. at 2088-89, 2090 n.8. The Sixth Circuit in Enoch relied upon Dintz and Jorn to hold that "when a criminal defendant's successful request for a mistrial is precipitated by 'prosecutorial or judicial overreaching,' a subsequent trial on the same charges is barred by the double jeopardy clause." Enoch, 650 F.2d at 117. It is this standard that the Supreme Court in Kennedy found too broad to apply. 456 U.S. at 674, 102 S. Ct. 2089. In adopting the Kennedy standard in Tucker, this court noted that it protected both the "defendant's right to a fair trial and society's right to have guilty criminals convicted" by reserving the double jeopardy bar for only those instances in which the prosecutor sought to cause the defendant to foreclose submitting the case to a particular jury:

> In the overwhelming majority of the cases, corrective instructions to the jury can be utilized to remove the taint of less serious prosecutorial misconduct. In cases of more

serious error, the court can admonish the prosecutor in the presence of the jury, expressing the court's disdain for the prosecutor's improper actions. Finally, in the most egregious cases, the trial judge can, upon a defense motion, grant a mistrial and preserve the defendant's right to a retrial before another untainted jury. Only when it is shown that the prosecutor is "goading" the defense into moving for a mistrial will double jeopardy bar a retrial.

Tucker, 728 S.W.2d at 31. Thus, overreaching or misconduct alone is insufficient to bar a retrial.

In its order denying the defendant's motion to bar retrial, the trial court found that no prosecutorial misconduct or trial court error forced a mistrial in this case. The record does not preponderate against this finding. The defendant moved for a mistrial following the jury's February 12 note, arguing that the jury was hopelessly deadlocked. The prosecutor agreed with the trial court that the jury was merely asking for further instruction. The trial court even stated that it was amazed that the defendant did not want the jury to deliberate further on the issue. After the trial court provided additional instructions on insanity and the jury deliberated further, the jury announced its inability to reach a verdict. At this point, the trial court determined that the jury was deadlocked, the defendant requested a mistrial, and the discussion focused on whether the trial court could ask the jury about its numerical split. Nothing about these events suggests that the prosecutor or the court was attempting to goad the defendant into requesting a mistrial.

The defendant makes numerous allegations of prosecutorial misconduct and judicial overreaching, which he claims precipitated the jury's inability to reach a verdict. With regard to prosecutorial misconduct, he argues that the prosecutor made improper and prejudicial arguments to the jury which caused it to be unable to reach a verdict. He contends that the state's proof of his sanity was weak and hinged upon the testimony of Dr. Herbert Speigel. He argues that Dr. Speigel misapplied the M'Naughten test for insanity and that the jury obviously rejected Dr. Speigel's testimony that the defendant did not suffer from a mental disease. Thus, the defendant claims that in light of all the experts who found the defendant insane under the Graham test or who could not disprove insanity, the jury necessarily based its inability to reach a verdict upon the prosecutor's improper arguments. He also contends that the prosecutor engaged in misconduct during trial, which included his failure to approach the bench during bench conferences, personal comments to the jury, and conduct revealing his obvious hatred of the defendant. Although the defendant acknowledges the difficulty in linking this alleged conduct to the jury's inability to reach a verdict, he argues that once he has shown that the misconduct occurred, the state must show that the conduct did not precipitate the jury's inability to reach a verdict. To the contrary, as noted above, the defendant must prove that the evidence preponderates against the trial court's finding that no prosecutorial misconduct forced a mistrial in this case. See Nixon, 669 S.W.2d at 681.

Regarding his claims of judicial overreaching, the defendant contends that the following actions on the part of the trial court resulted in the state securing the testimony of Dr. Speigel: engaging in a sua sponte and ex parte investigation of his mental condition; failing to hold a hearing pursuant to McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997), on the admissibility of

11

Dr. Speigel's testimony; failing to exclude Dr. Speigel's testimony on the basis of Rules 104, 403, 702, and 703, Tenn. R. Evid.; permitting Dr. Speigel to testify pursuant to the state's leading questions to opinions not contained in his one and one-half page report; and failing to require Dr. Speigel to give his opinions to a reasonable degree of psychiatric certainty. He contends that the trial court erroneously permitted the state to present the testimony of Dr. Speigel and Dr. Neil Haskell, an entomologist, in rebuttal rather than granting his motion for a judgment of acquittal for insufficient evidence at the end of the state's proof with regard to his sanity or to the murder of Patricia Johnson. He also asserts that the trial court erroneously refused to suppress his 1992 statements, which resulted in the jury's inability to reach a verdict because the statements constituted the sole evidence linking him to the murders. He contends that the trial court erroneously denied him funds and international assistance to locate Astrid Poppy, a German citizen whom "Kyle," one of the defendant's alternate personalities, falsely confessed to raping. He also asserts that the trial court overreached by erroneously redacting the portions of his statements that related to Astrid Poppy. He argues that the trial court's erroneous and arbitrary admission of evidence under Rule 404(b), Tenn. R. Evid., precipitated the jury's inability to reach a verdict on insanity or to announce a verdict on factual guilt. He contends that the trial court overreached by sua sponte instructing the jury to disregard defense counsel's arguments outlining the involuntary hospitalization process contained in Tenn. Code Ann. § 33-7-303. He argues that the trial court erroneously failed to instruct the jury on the time of the offense contained in the bill of particulars for Patricia Johnson's murder. He claims the trial court overreached by instructing the jury to continue its deliberations at a time when neither the defendant nor the court reporter were in the courtroom. He claims that the trial court's disqualification constitutes overreaching and infected every ruling and proceeding, causing the jury to be unable to reach a verdict.

Even taking all of the defendant's allegations of prosecutorial misconduct or judicial overreaching as true, we conclude that none of this conduct reveals that the prosecutor or the trial court intended to provoke a mistrial. Furthermore, nothing alleged by the defendant gives any reason to expand upon the requirement in Tucker that the prosecutor or court must intend to provoke the defendant's request for a mistrial.

In addition to the allegations regarding the conduct on the part of the prosecutor and trial court during the murder trial, the defendant contends that conduct preceding his murder trial caused the jury to be unable to reach a verdict. He lists the following conduct as resulting in the state securing the testimony of Dr. Speigel: prosecutorial delay in bringing the rape cases before the murder cases; prosecutorial manipulation of the Rule 12.2(c), Tenn. R. Crim. P., mental evaluation process; the trial court continuing the murder trial sua sponte three times over defendant's objection and request for a speedy trial; the trial judge's refusal to hear any motions from May to August 1998 due to his campaign for reelection; and the trial court's permitting the state to abuse the Rule 16(a)(1)(D), Tenn. R. Crim. P., disclosure process by not revealing Dr. Speigel's report until shortly before trial. He argues that the prosecutor directed law enforcement officers to violate the defendant's constitutional rights in November 1992 regarding the taking of the "Kyle" and "Philip Dax" statements, which precipitated the jury's inability to reach a verdict in the murder case. He argues that Judges Jenkins and Baumgartner were biased against the defense as reflected in their treatment of the Rule 12.2(c)

12

issue in the rape cases. He also contends that his invalid convictions in the Hanshaw and consolidated rape cases affected his defense and prevented him from testifying in the murder cases. He argues that the trial court's failure to rule on the motions for new trial in these cases before his murder trial foreclosed his opportunity to have those convictions overturned on appeal before his murder trial.

Regarding the pretrial events relating to his murder trial, he contends that the trial court's allowing the state to join the four murder cases for trial precipitated the jury's inability to reach a verdict. He alleges that the trial court erroneously permitted the state to disclose only testifying experts and to withhold consulting experts, forcing the defendant to prepare his defense without disclosure of Dr. Speigel's report until shortly before trial. He contends that the trial court erroneously delayed in ruling on the motion to suppress his statements until shortly before trial and that this overreaching lead to the erroneous admission of those statements, which were the only evidence linking him to the murders. Finally, the defendant argues that the totality of the overreaching, including the conduct, tactics, and proceedings that occurred before the 1999 trial, resulted in the jury having enough inadmissible evidence to be unable to announce a verdict. We fail to see the connection of these pretrial events to the mistrial in the present case. Because we can ascertain no evidence that the prosecutor or the trial court intended through any of the conduct alleged by the defendant to goad him into requesting a mistrial, double jeopardy does not bar a retrial due to prosecutorial misconduct or judicial overreaching. And again, we see no reason to expand upon Tucker.

The defendant contends that when the termination of the proceedings results from a deadlocked jury rather than a defendant's request for a mistrial, the question becomes whether the evidence, excluding that resulting from prosecutorial misconduct or judicial overreaching, is sufficient to support a verdict of guilt or whether the defendant was denied a fundamentally fair trial, precipitating the jury's inability to agree. The termination of the proceedings in the present case resulted from the defendant's request for and consent to the mistrial. The proper standard is whether the prosecutor or the trial court intended to goad the defendant into requesting the mistrial by prosecutorial misconduct or judicial overreaching. We hold that the standard was not met in this case and, therefore, that double jeopardy does not bar a retrial of the four first degree murder charges.

### III. SPECIAL VERDICTS

The defendant contends that the jury reached a verdict on factual guilt but that the trial court erroneously failed to take that verdict or any verdicts on the degree of homicide before releasing the jury. In his reply brief, he explains that the term "factual guilt," as used by himself and the trial court, refers to the commission of the act constituting the offense, excluding the issue of his sanity at the time the act was committed. Although not entirely clear, we take this to mean the commission of the killing. In support of his contention, the defendant argues that the court's instructions and the verdict form directed the jury to make multiple verdicts and that he had factual defenses to each homicide in addition to his insanity defense. He also argues that double jeopardy, res judicata, and collateral estoppel prohibit retrial of the issue of whether he suffered from a mental disease or defect because the jury rendered a special verdict as to that issue. The state argues that the jury had to determine

13

both the defendant's guilt of a particular offense and his sanity in order to render a verdict. It thus contends that there were no separate verdicts for the trial court to accept.

For each of the four victims, the trial court instructed the jury on the elements of first degree murder, second degree murder, and voluntary manslaughter. For victim Patricia Ann Johnson, the court also instructed on the elements of reckless homicide and criminally negligent homicide. Because the murders occurred before July 1, 1995, the defendant's insanity defense was a general defense rather than an affirmative defense. Tenn. Code Ann. § 39-11-501 (1991, amended 1995) (in post-1995 cases, the defendant has the burden of proving insanity by clear and convincing evidence). Thus, once the defendant raised the issue of insanity, the state had the burden of proving his sanity beyond a reasonable doubt. Regarding the insanity defense, the trial court instructed the jury:

> Included in the defendant's plea of not guilty is his plea that he was insane at the time of the commission of the offense. You are not to consider this defense unless you have found that the State has proven beyond a reasonable doubt the existence of each and every essential element of the crimes charged.

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

> A mental disease or defect is defined as any abnormal condition of the mind which substantially affects mental or emotional processes and impairs behavior control. Behavior controls refer to the processes and capacity of a person to regulate and control his conduct. The terms "mental disease or defect" do not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

The court instructed the jury that once the evidence raised a reasonable doubt about the defendant's sanity, the state had the burden of proving the defendant's sanity beyond a reasonable doubt.

Before deliberations and with the jury out, the court noted with regard to the verdict form: "I decided to just put the mental responsibility as a separate section. Obviously, if they find him insane, it is going to apply to all of it. So I just put that at the end. I think that makes it as clear as it can make it." Neither party objected to this. The court explained the verdict form to the jury as follows:

> What this does, ladies and gentlemen, is it starts with the four alleged victims in this case. It starts with Patricia Rose Anderson. The first paragraph is, "We, the jury, find the defendant Thomas Dee Huskey guilty, not guilty" – you circle one of those two, obviously – of the first degree murder of Patricia Rose Anderson."

> If you find him not guilty of that offense, then you go on to the lesser included offense. If you find him not guilty of second degree, you go on and consider voluntary manslaughter. If you find him guilty of a greater offense, you stop there.

14

Obviously, you don't have to go beyond that. Okay?

> It is listed for each of the four victims. . . . . And then the last question is the mental responsibility issue; and, if you find the defendant guilty of any offenses, it says, "Having found the defendant guilty, as indicated above, we the jury find," and then you will choose either the defendant sane beyond a reasonable doubt or not guilty by reason of insanity. Those will be your two choices there.

The jury began deliberations.

On February 11, the jury sent the court a note, which read: "Do we have to unanimously agree on all four charges? If we agree on all but one, are we a hung jury? What is the procedure?" During the course of the discussion about how the court would instruct the jury, the following exchange took place:

> [Defense Counsel]: Judge, let me bring something – I still do not understand how we are considering first degree murder separate from the issue of insanity. What I am saying to the Court is that, if Mr. Huskey were not guilty by reason of insanity, he could not possibly be guilty of first degree murder.

> The Court: He can be guilty of first degree murder, but not mentally responsible by reason – not guilty by reason of insanity.

> [Defense Counsel]: Well, we have always disagreed as to that, and I continue to disagree to that; because, if he was insane at the time, he did not have the mens rea to commit first degree murder.

> [Prosecutor]: The murders happened at different times.

> The Court: If they find him not guilty by reason of insanity, I agree that he is not criminally responsible then for that conduct.

> [Defense Counsel]: But we have an inconsistency in this verdict process that we are going through is what I am suggesting to the Court.

> The Court: You have no objection to that charge [relating to the jury's note]?

> [Defense Counsel]: No, but we continue to object to the manner in which they are being asked to state their verdict, because what if they come back and say, "We find him guilty of first degree murder, but we find him not guilty by reason of insanity"? Those are inconsistent verdicts.

15

On February 12, the jury sent the court a note, discussed in the above section, which stated:

> Your Honor:
> We are unable to come to a unanimous decision on mental responsibility. People's decisions are unlikely to change.
>
> Leslie Boone<br>Foreman
>
> We can agree that he has a mental disease or defect, but we cannot decide on the second part on p. 18 # 2 & 3. Can you give us some guidance?

On February 13, the trial court announced its intention to release the jury because it could not reach a unanimous verdict. It inquired about the jury's numerical split, to which one juror replied that the jury was split "[s]ix to six, but it was on the mental responsibility part, not the guilt."

In its order denying the defendant's motion to bar retrial, the trial court found that the defendant made no request that the jury be polled for any partial verdicts and that it had no duty to poll the jury sua sponte for a partial verdict. It also noted that the defendant specifically objected to any poll other than one for the jury's numerical split on sanity.

### A. Special Verdicts on the Act of Killing and the Degrees of Homicide

The defendant argues that his constitutional right to a verdict by a particular tribunal includes his right to verdicts on the issues of whether he committed the act of killing and which degree of homicide the jury found. The four counts of first degree murder were tried jointly over the defendant's objection, and each count had lesser included offenses. The defendant argues that the jury had to find that he committed the killings as a condition precedent to finding him criminally insane. He asserts that the jury instructions and the verdict form asked the jury to give special verdicts on whether he committed the act of killing, what degree of homicide he committed, and whether he was insane. He contends that the jury's February 12 note stating that the jury agreed that he had a mental disease or defect and the juror's comment that the jury was split six to six on the mental responsibility issue necessarily means that the jury had found the defendant guilty of some degree of one of the homicides. He argues that the jury was not deadlocked on the issue of whether he committed the act of killing. Thus, he contends that the trial court erred in failing to take these special verdicts and that double jeopardy bars a retrial because these special verdicts were not taken. Furthermore, he claims that he was prejudiced by the trial court's failure to collect these special verdicts because a jury finding on the act of killing would have entitled him to a Rule 3, T.R.A.P., appeal on many critical issues, thereby ensuring a fair opportunity for an acquittal in a new trial.

The state asserts that the jury could not render a verdict on the defendant's guilt for a particular offense without also determining his sanity at the time of the offense and that there were no separate verdicts for the trial court to accept. It contends that the trial court's request that the jury

first determine whether the defendant was guilty of any degree of homicide and then decide whether he was insane was error. It argues that the defendant's mental state at the time of each homicide was an essential element of that offense and that a finding on both the act of killing and sanity were necessary before the jury could render any verdict. It argues that because the jury was deadlocked on sanity, it could not have made a determination of the <u>mens rea</u> element of each offense. The state concludes that the trial court could not have taken findings on a degree of homicide for each victim.

Our review of the jury instructions and verdict form lead us to conclude that it was impossible for the jury to follow the trial court's instructions and that they could not arrive at any special findings regarding the degree of homicide. The instructions and the verdict form asked the jury to determine if the defendant was guilty of any degree of homicide before deciding if he was insane at the time of the offenses. Each degree of homicide requires the jury to consider the defendant's mental state at the time of the offense. Tenn. Code Ann. §§ 39-13-202, -210, -211, -212, -215. In this case, the defendant raised the issue of his sanity at the time of the offenses. The issue of whether the defendant was insane at the time of the offense is inextricably intertwined with the determination of the defendant's mental state at the time of the offense. <u>See</u> <u>Stone v. State</u>, 521 S.W.2d 597, 600-01 (Tenn. Crim. App. 1974) (holding that the defendant was not entitled to a bifurcated trial on the insanity issue because "the defense of insanity at the time of the crime is at issue under a plea of not guilty"). The request that the jury separate these considerations and first find the defendant guilty of some offense before considering whether he was insane – and therefore, not guilty – at the time of the offense was erroneous. Because the jury deadlocked on insanity, it could not have made any proper findings on the degree of homicide. Regarding the act of killing, we decline to infer a special verdict on the act of killing when the defendant did not request the trial court to take a special verdict and the jury did not affirmatively indicate that it made a finding on the act of killing.

The state contends that the trial court erroneously allowed the defendant to plead both not guilty and not guilty by reason of insanity. Citing Rule 11, Tenn. R. Crim. P., it argues that Tennessee law does not permit a plea of not guilty by reason of insanity. It asserts that, instead, the defendant should have pled not guilty and then advanced insanity as one of his theories of defense. The defendant contends that case law reveals that a plea of not guilty by reason of insanity is proper.

Rule 11(a), Tenn. R. Crim. P., provides that a "defendant may plead not guilty, guilty, or nolo contendere." In <u>Jimmy Don Spangler v. State</u>, No. 968, Hamilton County (Tenn. Crim. App. Apr. 2, 1987), <u>app. dismissed</u> (Tenn. June 29, 1987), the trial court sustained the state's objection pursuant to Rule 11 to the defendant's alternative pleas of not guilty and not guilty by reason of insanity. This court noted that the state was technically correct that Rule 11 did not provide for a plea of not guilty by reason of insanity and that "a plea of not guilty encompasses a plea of not guilty by reason of insanity." <u>Jimmy Don Spangler</u>, slip op. at 7-8. The court concluded that no reversible error resulted from the sustaining of the state's objection because the defendant developed his insanity defense at trial and the trial court instructed the jury to consider his insanity defense. We do not take this analysis to foreclose a plea of not guilty by reason of insanity. Furthermore, our supreme court has explicitly referred to a defendant pleading not guilty by reason of insanity. <u>Forbes v. State</u>, 559

S.W.2d 318, 328-29 (Tenn. 1977) ("It is our view that when any defendant, suffering from a mental illness that is cyclic, periodic or episodic in nature, characterized by periods of remission, interposes a plea of not guilty by reason of insanity, it is incumbent upon him to make out a prima facie case of insanity by offering evidence of non-remission at the time of commission of the crimes."); see, e.g., Sampson v. State, 553 S.W.2d 345, 346 (Tenn. 1977) (noting that the defendant pled not guilty by reason of insanity); Walden v. State, 178 Tenn. 71, 72, 156 S.W.2d 385, 385 (Tenn. 1941) (noting that the "defendant entered pleas of 'not guilty' and 'insanity'"); State v. Phillips, 968 S.W.2d 874, 875 (Tenn. Crim. App. 1996) (noting that the defendant pled not guilty by reason of insanity); Matlock v. State, 566 S.W.2d 892, 894 (Tenn. Crim. App. 1978) (noting that the defendant pled not guilty by reason of insanity). Even the uniform judgment document required by the supreme court provides for a verdict of not guilty by reason of insanity. See Tenn. S. Ct. R. 17. In fact, a jury must declare a not guilty verdict is by reason of insanity in order to trigger the sixty to ninety days detention of a defendant for evaluation. See Tenn. Code Ann. § 33-7-303(a). A plea to match the verdict can only be appropriate. In any event, the fact that the defendant in the present case pled both not guilty and not guilty by reason of insanity does not mean that the jury rendered special verdicts regarding the act of killing or the degree of homicide for each offense.

Finally, as a part of his argument that the trial court erred in failing to take the jury's special verdicts, the defendant contends that the trial court was not qualified to rule on his double jeopardy motion because it received an ex parte letter from the foreperson on February 15, 1999. He argues that the letter revealed the jury's numerical split on whether the defendant committed the killing and his sanity and the details of the jury's deliberations. He contends that the trial court failed to tell him that it had received the letter or to file the letter with the record. Upon learning of the letter, the defendant filed a motion to disqualify the trial judge. The trial judge overruled this motion, stating that his secretary received and opened the letter and that he did not read it. The defendant contends that the trial judge's receipt of this letter provides a reasonable basis to question whether the judge had personal knowledge of the jury's verdict on the act of killing at the time the judge ruled on the defendant's motion to bar retrial. He argues that at the very least, receipt of the letter creates the appearance that the trial court had personal knowledge of facts before the court in the motion to bar retrial, and therefore, the trial judge was not qualified to rule on the defendant's motion.

A trial judge should grant a motion to recuse whenever his or her impartiality can reasonably be questioned. Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App.1994). Recusal is "warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge would find a reasonable basis for questioning the judge's impartiality." Id. The standard of review on appeal is whether the trial court abused its discretion by denying the motion. State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App.1993). The Code of Judicial Conduct states in pertinent part:

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
      (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts

18

concerning the proceeding;

. . . .

Tenn. S. Ct. R. 10, Cannon 3 E.

Initially, we note that the defendant's argument regarding the trial court's receipt of a letter from the jury foreperson has no bearing upon whether the trial court should have attempted to collect special verdicts before discharging the jury. In any event, the record reflects that the trial court did not read the letter and, therefore, had no personal knowledge of any facts at issue in the defendant's motion to bar retrial.

## B. Factual Determination on Mental Disease or Defect

The defendant contends that the jury found that he had a mental disease or defect, and therefore, double jeopardy, res judicata, and collateral estoppel prevent the state from relitigating that issue in any future trial. He asserts that his mental state at the time of the offenses and at the time he made statements to the police will be an issue in the event of a retrial. He maintains that in its February 12 note, the jury announced that it unanimously agreed that the defendant suffered from a mental disease or defect. He argues that jeopardy attaches to this finding. He also summarily contends that res judicata and collateral estoppel prevent the state from relitigating the issue of whether he suffered from a mental disease or defect. He argues that this finding by the jury implicates the voluntariness of his statements to the police, the manner in which his Rule 12.2(c) mental evaluations were conducted, the striking of the insanity defense in the Hanshaw rape case, the striking of the right to use expert testimony in the consolidated rape cases, and the sentencing in the Hanshaw and consolidated rape cases. The state does not respond to this argument other than advancing the general argument that the jury cannot return any verdict without a finding on both insanity and the elements of the offenses.

As set out above, on February 12, 1999, the jury sent the trial court a note which stated:

Your Honor:
   We are unable to come to a unanimous decision on mental responsibility. People's decisions are unlikely to change.
                                        Leslie Boone
                                        Foreman

We can agree that he has a mental disease or defect, but we cannot decide on the second part on p. 18 # 2 & 3. Can you give us some guidance?

In its order on the defendant's motion to bar retrial, the trial court made no determination regarding whether this note constituted a finding of fact by the jury.

The defendant contends that res judicata bars relitigation of the issue of mental disease or

19

defect. Our supreme court has noted the following distinction between the doctrines of res judicata and collateral estoppel:

> "The doctrine of res judicata bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined in the former suit."

Richardson v. Tennessee Bd. of Dentistry, 913 S.W.2d 446, 459 (Tenn. 1995) (quoting Goeke v. Woods, 777 S.W.2d 347, 349 (Tenn. 1989)). "'Res judicata' bars relitigation of the same cause of action between the same parties where there is a prior judgment, whereas 'collateral estoppel' bars relitigation of a particular issue or determinative fact." Black's Law Dictionary 905 (6th ed. 1991). In the present case, the defendant's mental disease or defect is not a cause of action but rather a single issue or determinative fact within an action. Therefore, we will consider whether collateral estoppel applies.

The doctrine of collateral estoppel in the criminal law stems from the constitutional protection against double jeopardy. Ashe v. Swenson, 397 U.S. 436, 445-46, 90 S. Ct. 1189, 1195 (1970); see State v. Allen, 752 S.W.2d 515, 516 (Tenn. Crim. App. 1987) (analyzing the application of collateral estoppel as defined in Ashe in a double jeopardy challenge under both the state and federal constitutions). This doctrine prevents relitigation of issues necessarily decided in an earlier trial: Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe, 397 U.S. at 443, 90 S. Ct. at 1194. The policy behind the doctrine lies in the inherent reliability of final judgments. Standefer v. United States, 447 U.S. 10, 23 n.18, 100 S. Ct. 1999, 2007 n.18 (1980) (noting that collateral estoppel "is premised upon an underlying confidence that the result achieved in the initial litigation was substantially correct"). Criminal collateral estoppel shares this policy with civil collateral estoppel, but the policy of preventing further harassment to the party prevailing in the initial trial weighs more heavily in the criminal context. Daniel K. Mayers & Fletcher L. Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv. L. Rev. 1, 32 (1960). Procedurally, when a defendant's first trial ends in a general verdict of acquittal, the trial court must examine the record of the first trial; consider the pleadings, proof, jury instructions, and other relevant matters; and determine if a rational jury could have returned the verdict based upon an issue different from the one the defendant wants to bar. Ashe, 397 U.S. at 444, 90 S. Ct. at 1194. The determination should be practically oriented and must look to all the circumstances of the first trial. Id. The defendant bears the burden of establishing that the issue that he or she seeks to preclude was actually determined in the first trial. Schiro v. Farley, 510 U.S. 222, 232, 114 S. Ct. 783, 790 (1994); State v. McKennon, 6 S.W.3d 508, 511 (Tenn. Crim. App. 1998) (noting that the defendant bears the burden of showing that the issue that cannot be relitigated was actually decided and necessary to the judgment in the first trial).

In the present case, the defendant seeks to bar retrial of the issue of whether he suffered from

20

a mental disease or defect at the time of the offenses. The jury's statement that it could agree that the defendant had a mental disease or defect does not arise out of a previous judgment of acquittal but, instead, was reported to the trial court before it determined that the jury was deadlocked in the present case. In this way, the circumstances of the present case are distinct from those in Ashe, in which the state sought to try the defendant for the robbery of the six victims successively despite his acquittal of the robbery of one of the victims in the first trial. See 397 U.S. at 439-40, 90 S. Ct. at 1192. We examine whether this distinction is fatal to the defendant's argument.

Unlike the first trial in Ashe, which resulted in a final verdict of acquittal, the present murder trial resulted in a deadlocked jury. Thus, the jeopardy which attached at the time the jury was sworn did not end but is deemed to be continuing. See Richardson v. United States, 468 U.S. 317, 325, 104 S. Ct. 3081, 3086 (1984) (concluding that when the trial court declares a mistrial after the jury deadlocks, the original jeopardy does not end). Furthermore, the jury's purported resolution of the issue of the defendant's mental disease or defect is not an issue "determined by a valid and final judgment" as required by Ashe. See 397 U.S. at 443, 90 S. Ct. at 1194. Although not conclusive to the present issue, we note that in the context of civil law, our supreme court has required a final judgment in the previous case before preclusion can occur under both the doctrines of res judicata and collateral estoppel. Richardson v. Tennessee Bd. of Dentistry, 913 S.W.2d at 459. This requirement is in keeping with the policy behind collateral estoppel of affirming the inherent reliability of judgments.

Furthermore, in analyzing whether a defendant timely filed a motion for new trial over thirty days after the jury's verdict but before the trial court entered the judgment in a criminal case, our supreme court observed in dicta that neither res judicata or collateral estoppel apply in the absence of a judgment: "A verdict, before a judgment has been entered thereon, has no finality, cannot be executed, and cannot be pleaded in bar as res judicata or offered in evidence as collateral estoppel." Neeley v. State, 210 Tenn. 52, 56-57, 356 S.W.2d 401, 403 (Tenn. 1962) (citations omitted). Although Neeley preceded the Supreme Court's holding in Ashe, which held that collateral estoppel in criminal cases derived from constitutional protections against double jeopardy, both Neeley and Ashe require finality. See Ashe, 397 U.S. at 443, 90 S. Ct. at 1194; Neeley, 210 Tenn. at 56-57, 356 S.W.2d at 403. We note that the Arizona high court has relied upon this language from Neeley to hold that collateral estoppel in a criminal case requires a judgment in the previous action and, in fact, that "the force of the estoppel is the judgment itself." State v. Williams, 639 P.2d 1036, 1038 (Ariz. 1982) (concluding that a trial court's finding that the state did not establish that the defendant had violated his probation did not preclude a subsequent prosecution for the sexual assault that formed the basis of the state's evidence at the revocation hearing).

The Seventh Circuit has applied the principles of collateral estoppel when the first jury acquitted the defendant of some counts but deadlocked on other counts. United States v. Bailin, 977 F.2d 270, 276 (7th Cir. 1992). Noting that the original jeopardy is deemed to continue in the event of a hung jury, the court concluded that issue preclusion arising out of separate counts of the first trial is not collateral: "Issue preclusion 'within the confines of a single claim or cause of action' is known as 'direct estoppel.'" Id. at 276 (quoting 18 Charles A. Wright, et al., Federal Practice & Procedure

§ 4418, at 169 (1981)). The court held that direct estoppel applies in a criminal case to bar the government from relitigating issues in the retrial of the mistried counts that were "necessarily and finally decided in the defendant's favor by reason of the jury's partial acquittal on other counts." Bailin, 977 F.2d at 276.

> Direct estoppel prevents a party from relitigating a fact which was already determined against it in "a decision that finally disposes of a part of a claim on the merits but does not preclude all further action on the remainder of the claim; issues common to both parts of the claim are precluded, even though new issues remain to be decided."

Id. (quoting Wright, supra, § 4418, at 169-70).

The Third Circuit explored the meaning of the necessary and final determination of an issue for purposes of collateral estoppel in United States v. Console, 13 F.3d 641 (3d Cir. 1993). The defendant was acquitted of some counts of mail fraud, but the jury was not able to reach a verdict on his Racketeering Influenced Corrupt Organizations Act (RICO) counts and other mail fraud counts. The defendant argued that the trial court erred in denying his request for special verdicts on the predicate offenses in the RICO counts and that this error foreclosed his use of collateral estoppel to preclude retrial on those predicate counts. The court held that a defendant has no right to special verdicts on the elements of the offense and that the decision to submit special interrogatories to the jury regarding the elements of the offense is within the court's discretion. Id. at 663. The court also explained that even if the trial court had submitted interrogatories to the jury and the jury had found that the predicate acts had not been established, collateral estoppel or direct estoppel under Bailin would not preclude retrial on the predicate offenses because responses to special interrogatories are not "final" judgments or "necessary" to a final judgment. Id. at 664-65. The court reasoned that the predicate offense was not a RICO violation but merely one element of the offense. Id. at 664 n.27. Thus, the Third Circuit concluded that a factual finding on a count that eventually results in a mistrial due to a hung jury does not preclude relitigation of that issue on retrial. Id. at 664-65.

In contrast, a North Carolina appellate court has determined that a jury's special verdict on the court's jurisdiction precluded relitigation of that issue upon retrial even though the jury was deadlocked on the defendant's guilt. State v. Dial, 470 S.E.2d 84, 89 (N.C. Ct. App. 1996). In Dial, the defendant, a Virginia resident, was charged with the first degree murder of a Virginia resident, whose body washed onto a North Carolina beach. At the first trial, the jury returned a special verdict on jurisdiction but deadlocked on the defendant's guilt. On retrial, the defendant was convicted of second degree murder, and he argued on appeal that the trial court erroneously refused to set aside the special verdict. Analyzing the case in terms of collateral estoppel as derived from res judicata, the appellate court observed that when "'a fact has been agreed on, or decided in a court of record, neither of the parties shall be allowed to call it in question, and have it tried over again at any time thereafter, so long as the judgment or decree stands unreversed.'" Id. at 89 (quoting Humphrey v. Faison, 100 S.E.2d 799, 804 (N.C. 1957) (internal quotation marks omitted)). The court held that the special verdict met all of the prerequisites for issue preclusion:

> (1) the parties are the same; (2) the issue as to jurisdiction is the same; (3) the issue was raised and actually litigated in the prior action; (4) jurisdiction was material and

relevant to the disposition of the prior action; and (5) the determination as to jurisdiction was necessary and essential to the resulting judgment.

Id. at 89.

The North Carolina appellate court did not require a final judgment in the first trial in order for an issue resolved in the first trial to preclude the same issue in a subsequent trial. See id. at 89. We believe, though, that the court's failure to require a final judgment is inconsistent with the requirement of a final judgment for the application of res judicata based collateral estoppel under Tennessee case law. See Richardson v. Tennessee Bd. of Dentistry, 913 S.W.2d at 459. Furthermore, as previously noted, our supreme court has stated that a final judgment is required before collateral estoppel can bar retrial of an issue in a criminal case. Neeley, 210 Tenn. at 56-57, 356 S.W.2d at 403. This is consistent with the United States Supreme Court's requirement that the issue to be precluded must have been "determined by a valid and final judgment." Ashe, 397 U.S. at 443, 90 S. Ct. at 1194.

In the context of an acquittal, we note that as a practical matter, there is no need for a judgment for jeopardy to bar a retrial of the issue. It is a "deeply entrenched principle of our criminal law that once a person has been acquitted of an offense he cannot be prosecuted again on the same charge." Green v. United States, 355 U.S. 184, 192, 78 S. Ct. 221, 226 (1957). For instance, a conviction on a lesser included offense constitutes an implied acquittal of the greater offense if the jury had an opportunity to consider the greater offense before considering the lesser. Id. at 190-91, 78 S. Ct. at 225; State v. Madkins, 989 S.W.2d 697, 699 (Tenn. 1999). In that situation, double jeopardy protections prohibit a retrial on the greater offense. Green, 355 U.S. at 190, 78 S. Ct. at 225, Madkins, 989 S.W.2d at 699. In fact, in Ashe, which required a final judgment for collateral estoppel to preclude the relitigation of an issue, the defendant was acquitted in the first trial. 397 U.S. at 446, 90 S. Ct. at 1195-96. In other words, an acquittal enjoys the same finality as a judgment of conviction and, in this respect, bars retrial of issues necessarily decided by the acquittal.

Although not germane to the present case, we note in passing that bifurcated proceedings in which the determination of guilt is separate from that of punishment proceed differently. We do not allow the retrial of guilt when a retrial is ordered on punishment although no final judgment yet exists. See, e.g., State v. Hunter, 496 S.W.2d 900, 903 (Tenn. 1972) (remanding for retrial on only the penalty phase of a capital case); State v. Ward, 810 S.W.2d 158, 159 (Tenn. Crim. App. 1991) (affirming a retrial on the enhancement count of the indictment charging second offense DUI following a hung jury); State v. Freeman, 669 S.W.2d 688, 692 (Tenn. Crim. App. 1983) (affirming retrial of the habitual criminal count following a hung jury); State v. Hall, 667 S.W.2d 507, 510 (Tenn. Crim. App. 1983) (affirming retrial of the habitual criminal count following a hung jury).

In light of the continuing jeopardy in the case of a mistrial resulting from a deadlocked jury, we believe that the better reasoned approach is that a factual finding by a jury on a deadlocked count cannot preclude a jury from reconsidering that issue in a second trial. In the present case, the jury's

23

purported factual determination regarding the defendant's mental disease lacks even the finality of a special verdict much less the weight of a judgment and does not equate to a final disposition of that part of the case on the merits. Clearly, the jury's gratuitous statement that it could agree that the defendant had a mental disease or defect is not an acquittal of the defendant on any count in the presentment. Even if we assume that the jury's statement amounts to a partial resolution of the insanity issue, it has no preclusive effect because it lacks the requisite finality in terms of ending the

proceedings of a judgment or an acquittal. For these reasons, the jury's statement in its February 12 note does not have a preclusive effect on a retrial of the defendant's first degree murder charges.

Finally, in his reply brief, the defendant asserts that the jury's finding that he had a mental disease or defect mandates a verdict of not guilty by reason of insanity. He argues that the jury's finding on mental disease or defect indicates that they rejected the testimony of Dr. Speigel, the state's expert who deemed that the defendant was not insane. He contends that even considering Dr. Speigel's testimony, the evidence was insufficient to support a finding that the defendant had the substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law. Thus, he argues that double jeopardy bars a retrial and requires that a finding of not guilty by reason of insanity be entered.

Initially, we note that in support of this expansive assertion, the defendant cites only the jury's February 12 note and the trial court's instructions on the insanity defense. The Tennessee Rules of Criminal Procedure require that appellants support the issues they seek to raise with argument, citation to authorities, and appropriate references to the record. Tenn. R. Crim. P. 10(b). In any event, this court denied the defendant's Rule 10, T.R.A.P., application to appeal on the issue of sufficiency of the evidence because, as discussed above, the jeopardy that attached with the swearing of the jury in this case has not ended. State v. Thomas Dee Huskey, No. 03C01-9903-CR-00125, Knox County (Tenn. Crim. App. Apr. 26, 1999) (order), applic. denied (Tenn. Sept. 13, 1999); see Richardson, 468 U.S. at 325, 104 S. Ct. at 3086; State v. Bruce, 604 S.W.2d 889, 890 (Tenn. Crim. App. 1980) (holding that an interlocutory appeal to review the trial court's denial of a judgment of acquittal is not appropriate following a mistrial due to a deadlocked jury). The jury's inability to reach a verdict does not terminate jeopardy. Richardson, 468 U.S. at 325, 104 S. Ct. at 3086. For this reason, the defendant may not challenge the sufficiency of the evidence at the first trial in order to bar a second trial:

> The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree. Regardless of the sufficiency of the evidence at [the defendant's] first trial, he has no valid double jeopardy claim to prevent his retrial.

Id. at 326, 104 S. Ct. 3086. Thus, any insufficiency in the evidence at the first trial would not bar a retrial in this case.

## IV. CONCLUSION

In light of the foregoing and the record as a whole, we hold that double jeopardy does not bar

the retrial of the defendant on the four counts of first degree murder.  We remand the case to the trial court for further proceedings.


                        _____

                        JOSEPH M. TIPTON, JUDGE