# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 4, 2015 Session

## STATE OF TENNESSEE v. BRENDA WOODS

**Appeal from the Circuit Court for McNairy County**
**No. 3171    J. Weber McCraw, Judge**

---

### No.  W2014-01850-CCA-R3-CD  -  Filed October 7, 2015

---

The Defendant, Brenda Woods, was convicted by a McNairy County Circuit Court jury of three counts of procuring an illegal vote.  *See* T.C.A. §2-19-117 (2014).  The trial court sentenced the Defendant to two years to be served on community corrections.  On appeal, the Defendant contends that: (1) the evidence is insufficient to support her convictions; (2) her convictions violate double jeopardy; (3) the trial court erroneously admitted irrelevant evidence; and (4) the prosecutor made improper statements during closing argument. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ. joined.

Joseph A. McClusky (on appeal), Memphis, Tennessee; Daniel Taylor (at trial), Jackson, Tennessee, for the appellant, Brenda Woods.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Mike Dunavant, District Attorney General; Kirby May and Marques Young, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case arises from a May 2009 election in Hardeman County, in which several convicted felons illegally voted.  The Defendant was a candidate for local office and conducted a door-to-door campaign to encourage voter registration and voting and to transport people to vote.  A Hardeman County jury found the Defendant guilty of three counts of procuring an illegal vote.  On appeal, this court reversed the convictions and remanded for a new trial because of prosecutorial misconduct.  *See State v. Brenda Woods*, No. W2011-02366-CCA-R3-CD, 2012 WL 6476376 at *8-9 (Tenn. Crim. App.

Dec. 13, 2012). At the second trial, a McNairy County jury again found the Defendant guilty.

## Evidence at Trial

Amber Moore, Administrator of Elections for the Hardeman County Election Commission, testified that her job duties included registering people to vote, supervising elections, and maintaining voting records for the county. Ms. Moore stated that in 2009, a voter registration form required an applicant's name, birthdate, physical and mailing addresses, Social Security number, and affirmations of Tennessee residency and a lack of felony convictions. The form warned that "[g]iving false information to register to vote . . . is a felony." Ms. Moore said that the Election Commission relied on an applicant's truthfulness and did not verify the information provided on the form.

Ms. Moore testified that the Election Commission maintained electronic lists of people registered to vote and people who were disqualified from voting due to felony convictions. She said that if a person were listed as registered to vote, poll workers would not ask the person whether the person had been convicted of a felony. Ms. Moore mentioned that occasionally, a person appeared on the registered voter list and the disqualified voter list. If this happened, poll workers ensured the person's voting rights had been restored before allowing the person to vote.

Ms. Moore testified that she went to the Hardeman County Circuit Court Clerk's Office two or three times per month to obtain copies of felony judgments and to update the voter list. When a convicted felon was purged from the eligible voter list, Ms. Moore sent the person a letter of notification and a copy of the voting rights restoration paperwork. She said that individuals were responsible for taking the form to the court clerk and returning it to the Election Commission office. The court clerk had to verify that the person had served the felony sentence and that any restitution, court costs, and back child support were paid. She said that other counties sporadically sent her notices of recently convicted felons. She conceded that the system was not perfect.

Ms. Moore testified that in May 2009, the Defendant ran for the positions of mayor and city council member in Bolivar. Ms. Moore stated that the Defendant had sought public office in every local election since Ms. Moore began working as administrator and had previously served on the city council. Ms. Moore said that during early voting and on election day, the Defendant and her campaign volunteers transported voters to the polls. She saw the Defendant outside the Election Commission office during early voting a couple of times every one-half hour. The Defendant often came inside with the voters. Ms. Moore said that the Defendant's volunteers attempted to come inside the office with the voters and that they were warned repeatedly not to enter. Ms. Moore said she called the Defendant to address this issue.

Ms. Moore testified that the Defendant called the Election Commission office between seventy-five and one hundred times per week during early voting. The Defendant asked whether specific individuals were registered to vote or had voted already but never asked whether the individuals were convicted felons or had their voting rights restored. Ms. Moore said that the Defendant lost the mayoral election by 330 votes and won a city council seat by thirty-four votes.

Ms. Moore testified that in July or August after the election, the State Division of Elections cross-referenced the voter roll with Tennessee Department of Correction records. Ms. Moore received a list of ten people who were convicted felons and had voted in the May 2009 election, including Yolanda Giles, Amos Watkins, and Taletha McNeal Traylor. Ms. Moore purged their names from the registered voter list and reported to the district attorney general that they had voted in the May 2009 election.

Ms. Moore testified that Yolanda Giles registered to vote on January 28, 2009, and that Ms. Giles marked on the voter registration form she had not been convicted of a felony. Ms. Moore said Ms. Giles was convicted of a felony in April 1997. Ms. Giles voted in the May 19, 2009 election.

Ms. Moore testified that Amos Watkins registered to vote on April 15, 1997, May 18, 2007, and May 1, 2009. His three registration forms affirmed that he had not been convicted of a felony. Ms. Moore said that Mr. Watkins was convicted of a felony on June 8, 2001, and that he voted in the 2002, 2005, 2007, and May 2009 elections.

Ms. Moore testified that Taletha Traylor registered to vote on June 18, 1986, and May 17, 2006, and marked on both forms that she had not been convicted of a felony. Ms. Traylor was convicted of a felony on August 14, 1996, and voted in the 2008 and May 2009 elections.

Ms. Moore testified that despite her efforts to obtain felony conviction information from the Hardeman County Circuit Court Clerk's Office, she did not know whether she received copies of every felony judgment. Ms. Moore said that court clerks were not required to notify other counties when a person was convicted of a felony.

Ms. Moore testified that Form 3033, a postcard-sized mailer designed to be sent from a court clerk to an election official to provide notice that a person had been convicted of a felony, was not used in Hardeman County but that she sometimes received the form from other counties. When Ms. Moore received the form, she updated the person's voter file to show that the person was disqualified from voting. She said that if a person were uncertain whether the person was permitted to vote, the person could ask her.

Ms. Moore testified that when Amos Watkins voted in May 2009, he did not ask whether he was permitted to vote. Mr. Watkins's voter registration form did not note that he had assistance in completing it.

Ms. Moore testified that it was lawful for candidates to provide voters with transportation to the polls and to distribute forms for restoration of voting rights. She said that if a person's voter registration card were lost, Ms. Moore would not mail another card without obtaining a signature from the voter. If the Defendant had called Ms. Moore during the 2009 election regarding Mr. Watkins, Ms. Giles, and Ms. Traylor, Ms. Moore would have said that they were eligible to vote based upon her records.

Ms. Moore testified that she did not know whether the Defendant returned any completed voter rights restoration forms to her. She said that had Ms. Giles, Ms. Traylor, or Mr. Watkins filed restoration paperwork on the dates they voted, their rights would not have been restored before the May 19 election. Ms. Moore said that in her opinion, the Defendant knew what was permissible regarding the election process. Ms. Moore testified that she did not observe Mr. Watkins, Ms. Giles, or Ms. Traylor vote and that she did not know whether the Defendant provided them transportation to the polls.

Hardeman County Circuit Court Clerk Linda Fulghum testified that she maintained the records for the circuit and criminal courts, including judgment forms. Ms. Fulghum said the court records reflected that on March 14, 1997, Ms. Giles was convicted of the delivery of cocaine, that on October 12, 1995, Ms. Traylor was convicted of forgery, and that on May 14, 2001, Mr. Watkins was convicted of reckless aggravated assault. Ms. Fulghum said these offenses were felonies. Ms. Fulghum testified that generally, copies of felony judgments were collected by Election Commission employees or were mailed to the commission.

Ms. Fulghum testified that she had known the Defendant for years through her family as well as through the clerk's office. The Defendant obtained records from the clerk's office and asked for specific items, including information on restoration of voting rights. Ms. Fulghum also saw the Defendant in the courtroom on occasions when the Defendant assisted people with their cases.

Ms. Fulghum testified that anyone could request records from her office. She did not know whether the Defendant was present when Ms. Giles, Mr. Watkins, or Ms. Traylor pleaded guilty or whether the Defendant had requested their respective conviction information.

Hardeman County Deputy Circuit Court Clerk Rhonda Sipes testified that she provided copies of judgments to people who requested them, explained the voting rights restoration process, and verified that restitution had been paid and the sentence had

expired. Ms. Sipes said that she had discussed the restoration process with the Defendant about ten times.

Ms. Sipes testified that during the 2009 election, the Defendant asked for restoration forms on behalf of other people. She said that the Defendant usually knew whether a voter was a convicted felon, but Ms. Sipes did not remember the Defendant asking about any particular voter.

Yolanda Giles testified that on April 18, 1997, she pleaded guilty to a felony. She said she registered to vote on January 28, 2009, for the sole purpose of obtaining her driver's license.

Ms. Giles testified that she had known the Defendant for twenty or thirty years because they lived in the same area. She said the Defendant, while campaigning door-to-door, approached her and asked for her vote. Ms. Giles told the Defendant that she was a felon and that she did not have a voter registration card. The Defendant said that "you guys can vote because [felons were] getting their rights restored." The Defendant told her, "I'll get [a voter registration card] for you," made a telephone call, and told Ms. Giles to let her know if she did not receive a card in the next couple of days. The Defendant said that she would return and that Ms. Giles did not have to worry about transportation to the polls. The voter registration card arrived in the mail, and Ms. Giles said the Defendant contacted her to ensure she had received the card.

Ms. Giles testified that during early voting, the Defendant picked her up in a white van driven by Larry McKinnie. They went to the Election Commission office, and Ms. Giles voted. Ms. Giles said that she voted because her pastor and the Defendant talked about felons' restoring their voting rights. Ms. Giles said the Defendant changed Ms. Giles's opinion about whether she could vote.

Ms. Giles testified that at the time of the first trial, she had no agreement with the State in exchange for her testimony and that she did not know state law required her charge be dismissed after she testified.

Ms. Giles testified that she was interviewed by Tennessee Bureau of Investigation (TBI) Special Agent Harmon in March 2010. She said that the Defendant was not present when she registered to vote.

Ms. Giles testified that she did not sign any papers before the Defendant arranged for the Election Commission to send a replacement voting card. She said that she and the Defendant never discussed restoring voting rights. Ms. Giles said that she heard in church that felons could have voting rights restored and that "when [the Defendant] said that she could get . . . the card, I thought, okay, well, maybe it's okay [to vote]." Ms.

Giles and the Defendant did not discuss whether Ms. Giles had submitted a form to have her voting rights restored.

When asked at the first trial whether the Defendant knew of Ms. Giles's conviction, Ms. Giles recalled answering, "Well, we had discussed some other things and I told her and I'm sure this being a small town, everybody knows." Ms. Giles said she assumed the Defendant knew of her conviction.

On redirect examination, Ms. Giles clarified relative to the transcript of the first trial that she plainly told the Defendant that she had a felony conviction. When asked why she relied upon the Defendant's assertion that she could vote, Ms. Giles said, "Because she was running for councilwoman and I figured she had knowledge and knew what she was talking about."

Amos Watkins testified that he was an acquaintance of the Defendant and that he was convicted of felonies on June 8, 2001, and in February 2011. He registered to vote in 1997, on May 18, 2007, and on May 1, 2009. He said that he did not understand the effect of a felony conviction on his ability to vote. Mr. Watkins voted several times after his felony convictions. Mr. Watkins stated that the 2007 and 2009 voter registration forms were completed for him by Mr. McKinnie and that Mr. Watkins only signed the forms.

Mr. Watkins testified that on May 1, 2009, he saw the Defendant and Mr. McKinnie arrive in a van. The Defendant asked Mr. Watkins to come with her and vote for her. Mr. Watkins told the Defendant that he thought he had a felony conviction, but he was unsure. The Defendant went to the van and made a telephone call. Mr. Watkins said the Defendant returned and told him he could vote. Relying on her statement, he went to the Election Commission office and voted. Mr. Watkins said that before he got into the van, the Defendant told him that he owed her a favor and that she knew he was going to vote for her. Once they arrived at the Election Commission office, Mr. McKinnie accompanied Mr. Watkins inside, and the Defendant remained in the van.

Mr. Watkins testified that he was charged with illegal voting. He said he testified at the Defendant's first trial that he did not have an agreement with the State. He said that at the time of the first trial, he was unaware state law mandated that his charges be dismissed after he testified. Mr. Watkins stated that he did not know the difference between a felony and a misdemeanor. He said that he could write but could not read well. He did not realize that he had committed a crime each time he signed the registration form and voted after his felony convictions. Mr. Watkins said he did not ask anyone at the Election Commission office whether he could vote.

Mr. Watkins testified that he did not know who the Defendant called on May 1, 2009. He said that when Mr. McKinnie completed the registration form and asked whether Mr. Watkins had a felony conviction, Mr. Watkins stated he did not know. Mr. Watkins testified that he did not recall if he saw Debbie Jones or Pamela Turner when he voted. Mr. Watkins said that Mr. McKinnie asked him questions as Mr. McKinnie completed the voter registration form.

Debbie Jones testified that she was the Defendant's cousin and Mr. Watkins's former girlfriend. Ms. Jones said that in May 2009 she saw the Defendant in a gray van and that the Defendant asked her if she was going to vote. Ms. Jones told the Defendant that she could not vote because she was a convicted felon. The Defendant asked her about Mr. Watkins, and Ms. Jones told the Defendant that Mr. Watkins was a convicted felon.

Ms. Jones testified that Mr. Watkins did not tell her before May 2009 that he was a felon, and that although she knew, they did not discuss it. After reading from the first trial transcript, Ms. Jones acknowledged the Defendant told her that the Defendant would investigate Mr. Watkins's status and determine whether he could vote.

Ms. Jones testified that Mr. Watkins knew he was a convicted felon. Ms. Jones stated that she and Mr. Watkins were arrested together during the incident that led to one of Mr. Watkins's felony convictions.

Taletha McNeal Traylor testified that on October 18, 1995, she was convicted of a felony. She registered to vote in 1986 and on May 17, 2006. Ms. Traylor said that she did not understand the effect a felony conviction had on her voting rights until 2006. She said she registered to vote in order to use the identification card to register for vocational school. Ms. Traylor said that when she marked on the voting registration form, she had not been convicted of a felony, that "[it] was just an honest mistake," and that she did not intend to vote.

Ms. Traylor testified that she voted in the 2008 election and that the Defendant encouraged her to vote. She said that she had known the Defendant for twenty or thirty years but that they did not socialize. On May 8, 2009, Ms. Traylor was at a friend's house with a group of people drinking beer and listening to music on the porch. The Defendant and Mr. McKinnie arrived in a church van. Ms. Traylor said the Defendant asked them to come with her to early voting. Ms. Traylor told the Defendant that she was a convicted felon, but the Defendant said, "[C]ome on, let's go vote anyway, let's go vote." Ms. Traylor said she and two other people went to vote, taking their beers on the van.

Ms. Traylor testified that she was charged with illegal voting in the 2008 and 2009 elections. She said that at the first trial, she did not have an agreement with the State and that she did not know state law required a dismissal of the charges after she testified. Ms. Traylor stated that she did not know she had committed a crime by lying on the voter registration form. She said that when she pleaded guilty to a felony, she was not told she could not vote and that she did not receive a letter stating her voting rights had been terminated.

Ms. Traylor testified that in 2008, she knew she could not vote. She said, though, the Defendant "informed us different. That's why I voted." Ms. Traylor said she did not ask the election workers whether she could vote. Ms. Traylor later stated that she did not know whether she could vote. Ms. Traylor testified that on May 8, 2009, she thought she could vote because the Defendant told her she could in 2008. Ms. Traylor said she never talked to anyone about having her voting rights restored.

Ms. Traylor testified that in her TBI interview, she said the Defendant drove her to the polls in 2008 but did not mention the 2009 election. Ms. Traylor said that the Defendant drove her to the polls in 2009.

TBI Special Agent David Harmon testified that on January 6, 2010, his office was notified that fourteen Hardeman County convicted felons had been arrested for illegal voting. He interviewed Ms. Giles and Ms. Traylor, and Special Agent John Sullivan interviewed Mr. Watkins and Ms. Jones. Ms. Giles, Mr. Watkins, and Ms. Traylor told the agents that the Defendant told them that they could vote. Agent Harmon said he attempted to interview the Defendant. He said that based on his investigation, he recommended the Defendant's indictment.

Ms. Fulghum was recalled by the defense and testified that the guilty plea forms Ms. Giles, Mr. Watkins, and Ms. Traylor signed did not note that pleading guilty to a felony resulted in the loss of voting rights. Ms. Fulghum said she did not know whether defendants were advised of voting rights loss in the plea colloquy, but she said defense attorneys and trial judges had to review the impact of a guilty plea, including the loss of rights, with defendants.

Larry McKinnie, a former state trooper and lifelong friend of the Defendant, testified that he helped the Defendant's campaign by driving people to vote in a borrowed church van. He said if people were not registered to vote, he had voter registration forms in the van. Campaign volunteers completed the forms and delivered them to the Election Commission office. He said that if a person indicated a prior felony conviction, volunteers explained the voting rights restoration process. He stated that the Defendant called the Election Commission to determine if people were qualified to register or were registered to vote and that Ms. Fulghum determined whether a person had a felony

-8-

conviction. He said that he and the Defendant relied upon the information from the Election Commission.

Mr. McKinnie testified that he never provided Mr. Watkins or Ms. Giles with transportation to the polls and that he never assisted Mr. Watkins with registering to vote. Mr. McKinnie denied that his handwriting was on Mr. Watkins's registration form. Mr. McKinnie testified that he transported Ms. Traylor to vote but that as a retired state trooper, he would not have allowed alcohol in the van. He said he did not talk to Ms. Traylor about whether she could vote.

Mr. McKinnie testified that he and the Defendant had a romantic relationship in the 1980s and that he considered her like family. He said that when he and the Defendant spoke to people during the campaign, he and the Defendant usually stayed together and that she did most of the talking. Mr. McKinnie said that he assisted in completing voter registration forms but did not indicate on the form that he assisted the prospective voter in completing the form.

Pamela Turner testified that she voted in the May 2009 election at the Election Commission office and that when she left, she saw Ms. Jones and Mr. Watkins sitting in a truck across the street. Ms. Turner said the three of them discussed the election. Ms. Turner told them that she had just voted, and Ms. Jones said that she could not vote but that Mr. Watkins was going to vote. Mr. Watkins said he was going to vote, although he was a convicted felon. Mr. Watkins said that what "they" did not know would not hurt them. Ms. Turner said that as she left, she saw Mr. Watkins walking toward the Election Commission office. Ms. Turner acknowledged her prior testimony at the Defendant's first trial in which she had said that Ms. Jones and Mr. Watkins were being paid by the State for their testimony. Ms. Turner said that it "wasn't my place" to report Mr. Watkins for illegal voting and that she never spoke to the police before being contacted by defense counsel before the first trial. She did not know how counsel obtained her name.

Gloria Kelly-Smith testified that she volunteered with the Defendant's campaign by assisting with voter transportation. Ms. Kelly-Smith said that she never provided transportation to Ms. Giles and that she did not recall getting out of the van at Ms. Giles's house. Ms. Kelly-Smith never saw anyone get in the van with alcohol. She did not provide transportation to Mr. Watkins.

Reverend Manual Donis of Pleasant Grove Church testified that he had known the Defendant for about twenty years and that in May 2009, he allowed the Defendant to use church vans for her campaign. He said he loaned the vans to the Defendant because she was helping people restore their voting rights. Reverend Donis said that the Defendant and his church were collaborating and that announcements were made in church about

registering to vote and restoring voting rights. Reverend Donis said that the Defendant was knowledgeable about elections and the effect of a felony conviction on the right to vote.

Upon this evidence, the Defendant was convicted of three counts of procuring an illegal vote. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant argues the evidence is insufficient to support her convictions. The State responds that the same evidence was introduced at the first trial and that this court held the evidence was sufficient to support the original convictions.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 2-19-117 states that it is unlawful for "any person to procure, aid, assist, counsel or advise another to vote in any . . . election, knowing such person is disqualified." Tennessee Code Annotated section 40-20-112 (2012) states that any person convicted of a felony is disqualified from voting.

In the light most favorable to the State, the evidence reflects that the Defendant was a perennial candidate for public office and worked to transport people to the polls to vote for her. She communicated often with the Election Commission and the Circuit Court Clerk Offices. She asked questions and received information about felony offender

status and voter eligibility. The Deputy Circuit Court Clerk explained the voting rights restoration process to the Defendant numerous times, and the record reflects that the Defendant was knowledgeable about elections and the effect of a felony conviction on the right to vote.

The Defendant approached Ms. Giles, Mr. Watkins, and Ms. Traylor about voting in the May 2009 election. Ms. Giles and Ms. Traylor told the Defendant they had been previously convicted of a felony, and Mr. Watkins told the Defendant he might have been convicted of a felony. Ms. Jones informed the Defendant about Mr. Watkins's felony conviction immediately before the Defendant spoke to Mr. Watkins about voting.

After Ms. Giles and Mr. Watkins told the Defendant they could not vote because they were convicted felons, the Defendant made a telephone call and then told them they could vote. After Ms. Traylor told the Defendant that she had a felony conviction, the Defendant said, "[L]et's go vote anyway, let's go vote" and did not make a telephone call. The Defendant encouraged them to vote and provided them transportation to the polls. Ms. Giles, Mr. Watkins, and Ms. Traylor voted in the May 2009 election. No evidence shows that the Defendant attempted to assist in restoring their voting rights. We conclude that the evidence is sufficient to support the Defendant's convictions and that she is not entitled to relief on this basis

## II

### Double Jeopardy

The Defendant argues that the second trial violated double jeopardy principles because this court reversed the Defendant's convictions on prosecutorial misconduct grounds after the first trial. The State responds that although this court reversed the conviction on grounds sufficient to declare a mistrial, the Defendant did not request a mistrial or raise the issue in the first appeal. The Defendant concedes that she has raised this issue for the first time on appeal and requests plain error analysis.

The Fifth Amendment of United States Constitution and Article I, section 10 of the Tennessee Constitution provide that no person should be put "in jeopardy of life or limb" twice for the same offense. U.S. Const. amend. V, Tenn. Const. art. I, § 10. Generally, the grant of a defendant's motion for a mistrial does not bar a second trial. However, when a prosecutor intentionally provokes a defendant into requesting a mistrial, jeopardy attaches, and the defendant may not be retried. *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982); *see State v. Tucker*, 728 S.W.2d 27, 31 (Tenn. Crim. App. 1986); *see also State v. Huskey*, 66 S.W.3d 905, 917 (Tenn. Crim. App. 2001).

[D]ouble jeopardy does not bar a retrial when the defendant asks for a mistrial. [*Kennedy*, 456 U.S. at 672] . . . A narrow exception to this rule exists: "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Kennedy*, 456 U.S. at 676[.]

*Huskey*, 66 S.W.3d at 916. "Unless the trial court finds that the prosecutor intended his misconduct to provoke the defendant into requesting a mistrial, the defendant may be retried following the granting of the defendant's motion for a mistrial." *Tucker*, 728 S.W.2d at 32.

When determining whether an error constitutes plain error, five factors are relevant:

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642. "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). The defendant bears the burden of establishing the five factors necessary to grant plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)).

The Defendant urges this court to apply the rule articulated in *Kennedy* and *Tucker* and followed in *Huskey* to cases in which a defendant's conviction was reversed on appeal because a motion for a mistrial would have been granted had it been requested. As we have stated, *Kennedy*, *Tucker*, and *Huskey* stand for the proposition that double jeopardy is not a bar, generally, to retrial of a defendant. Only if the prosecutor intended to goad the Defendant into requesting a mistrial is retrial barred. *See Kennedy*, 456 U.S. at 676; *Tucker*, 728 S.W.2d at 31. The relevant question, then, is whether the Defendant has shown plain error because the State retried her in the face of a double jeopardy bar.

At the Defendant's previous trial, the prosecutor questioned witnesses who had pending charges about the fact that they did not have an agreement with the State in exchange for their testimony. In fact, state law required that the State dismiss all charges against the witnesses after they testified. By failing to disclose this fact to the jury, the prosecutor created a false impression that the witnesses had no incentive to testify against the Defendant. The prosecutor bolstered the witnesses' credibility in his closing argument by emphasizing the lack of an agreement with the State. This court concluded in the previous appeal that the prosecutor had an ethical obligation not to give a misleading impression and that reversal of the Defendant's convictions was warranted because witness credibility was critical. *See Brenda Woods*, 2012 WL 6476376 at \*8. Although the prosecutor engaged in misconduct, neither the record nor this court's opinion in the previous appeal support a conclusion that the prosecutor intended to provoke a mistrial. The Defendant has not shown that her case fell within the narrow exception to the general rule that double jeopardy does not bar retrial after a mistrial is granted. No clear and unequivocal rule of law was breached, no substantial right of the Defendant's was adversely affected, and we are not required to consider the issue in order to do substantial justice. Plain error relief is not required.

In reaching this conclusion, we have not overlooked the Defendant's argument that *Sentoryia Lawand Young v. State*, No. M2010-01762-CCA-R3-PC, 2011 WL 3630128 (Tenn. Crim. App. Aug. 18, 2011), *perm. app. denied* (Tenn. Nov. 16, 2011), compels a conclusion that double jeopardy barred the Defendant's retrial. In *Sentoryia Lawand Young*, counsel at the first trial requested and obtained a mistrial based on improper witness testimony that occurred despite the trial court's prior ruling that the evidence was inadmissible. *Id.* at \*2. After the second trial, the petitioner alleged the ineffective assistance of counsel based upon trial counsel's failure to raise a double jeopardy claim before the second trial. *Id.* at \*4. This court affirmed the post-conviction court's determination that the petitioner received effective assistance because the prosecutor had not elicited the improper testimony which led to the mistrial, and therefore the double jeopardy claim would not have succeeded. *Id.* at \*5.

The Defendant's reliance on *Sentoryia Lawand Young* is misplaced. S*entoryia Lawand Young* stands for the proposition that double jeopardy principles are implicated when a prosecutor elicits improper testimony with the intention of provoking a mistrial. The Defendant's argument that the State "goaded *reversal* by its actions" (emphasis added) relies on an extension of the law that is unsupported by *Kennedy* and *Tucker*. The Defendant's case is distinguished from *Sentoryia Lawand Young* because she has presented no evidence that the prosecutor in the first trial acted with the intention of provoking a mistrial when he questioned the witnesses regarding their motives for testifying. Because the Defendant has failed to establish a claim for plain error relief, she is not entitled to relief on this basis.

-13-

## Testimony of Ms. Moore and Ms. Fulghum

The Defendant contends that the trial court erred in admitting irrelevant testimony from Ms. Moore and Ms. Fulghum. The Defendant argues that Ms. Fulghum's statement relative to campaign volunteers entering the voting polls was irrelevant and that "[k]nowledge of how far into a voting center or how much assistance a candidate or supporter could provide to a voter cannot reasonably . . . be relevant to whether that person knew that voters were convicted felons." The State responds that the testimony was relevant to show the Defendant's general knowledge of the election process.

Ms. Moore testified that volunteers from the Defendant's campaign were warned repeatedly not to accompany voters inside the polls and that Ms. Moore called the Defendant to address the problem. Ms. Fulghum also testified to the frequency of the Defendant's visits to the clerk's office. The trial court found the witnesses' testimony was relevant to showing the Defendant's knowledge of election laws and the election process.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

The record reflects that the State was required to establish beyond a reasonable doubt that the Defendant knew Ms. Giles, Mr. Watkins, and Ms. Traylor were disqualified from voting. Knowing what disqualifies a voter and when a formerly disqualified voter has properly restored his or her right to vote requires knowledge of election laws and the election process. The Defendant's frequent visits to Ms. Fulghum's office to request voting rights restoration information were relevant to show the Defendant's knowledge of the restoration process for convicted felons. The testimony about Ms. Moore's warning telephone call to the Defendant about proper behavior for campaign volunteers was relevant to show the the Defendant's knowledge of the election process.

The Defendant contends that Ms. Moore's testimony was unduly prejudicial under Tennessee Rule of Evidence 403. We note that this issue was raised at the motion for new trial but that the trial judge did not make a finding as to whether the probative value of Ms. Moore's testimony was substantially outweighed by the danger of unfair prejudice. Pursuant to Tennessee Rule of Appellate Procedure 36(a), "relief may not be granted in contravention of the province of the trier of fact." Because the Defendant did not request further findings of fact regarding the prejudicial nature of Ms. Moore's testimony, the issue is waived. The Defendant is not entitled to relief on this basis.

Also relative to Ms. Moore's testimony, the Defendant contends for the first time on appeal that the testimony was erroneously admitted pursuant to Tennessee Rule of Evidence 404(b). She requests plain error review.

Rule 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id.*; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is an abuse of discretion, provided a trial court substantially complies with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

The Defendant has not shown that a clear and unequivocal rule of law was breached. Rule 404(b) did not bar the evidence because it was not offered to prove the Defendant's character. At the trial, the prosecutor said in the presence of the jury that "[Ms. Moore's statement] is relevant to the . . . candidate's knowledge of voter

requirements and restrictions."  The prosecutor did not state that the testimony was offered to prove the Defendant's propensity to violate the law.  The statement was not offered "to show action in conformity with the character trait."  *See* Tenn. R. Evid. 404(b).  The Defendant is not entitled to plain error relief.

## IV

## Prosecutor's Closing Argument

The Defendant contends that the prosecutor mischaracterized witness testimony twice during his closing argument.  The Defendant concedes that she made no objection at the trial and requests plain error review.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998).  However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010).  A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion.  *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader

than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6. (quoting Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

### A. Ms. Giles's Testimony

During its closing argument, the prosecutor summarized Ms. Giles's testimony as follows:

[W]hen asked, "Did you tell the defendant that you were a convicted felon?" She said, "Yes and we talked about some other things". It was later on, the question was asked again in unequivocal terms, "did you tell the defendant that you were a convicted felon?"

The Defendant argues that Ms. Giles's testimony was misstated by the prosecutor because Ms. Giles continued to say that the Defendant told Ms. Giles, "[Y]ou guys can vote because [felons are] getting their voting rights restored," reflecting negatively upon the Defendant. The State responds that the simplified statement is relevant to the Defendant's knowledge of Ms. Giles's status as a convicted felon, that the Defendant did not have Ms. Giles go through the restoration process, and that any error was harmless.

During jury selection and closing arguments, trial counsel told the jury that objections were part of an attorney's job, that the parties and the court were trying to complete the trial promptly, and that jurors should not favor one party over the other because of the number of objections raised by an attorney. Counsel was aware of the rules of evidence, made numerous other objections, and requested jury-out hearings during the course of the trial. As stated above, the Defendant bears the burden of establishing plain error, which entails establishing the five factors of plain error. *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007); *see State v. Smith*, 24 S.W.3d 274, 282. The Defendant has not established that counsel's failure to object was not tactical. As a result, the Defendant is not entitled to plain error relief.

## B. Ms. Turner's Testimony

The prosecutor in closing argument pointed out an inconsistency in Ms. Turner's testimony between the two trials about Ms. Jones's truck color and the circumstances surrounding Ms. Turner's involvement in the case. The prosecutor summarized Ms. Turner's testimony as follows:

> Pam Turner, she testified that she saw the defendant [sic] in a red truck. That was not stated in a prior hearing. She also could not tell you how she got involved with this case. This is why this is important. She stated she did not know the defendant. She's just seen her on TV or seen her around. She had to tell someone or go straight, directly to them in order to say that "I saw Amos voting and he voted". It came up no other time except when she ran straight [to] them and not law enforcement. I also talked about a prior hearing where she made an allegation – again, for the first time on the stand – that Amos and Debbie were getting paid. Does that make sense? Why would they get paid knowing the allegation and then it's the first time it's been told, the first time on the witness stand. There were a lot of firsts for her on this witness stand.

The Defendant argues that the statement about "a lot of firsts" was false and that Ms. Turner's testimony at the second trial was nearly identical to her prior testimony. At oral argument, the State replied that the prosecutor meant that at the *first* trial, Ms. Turner revealed pieces of information that she did not share with the police before testifying. The State further argues that these issues do not meet the necessary elements to be plain error.

As discussed above with regard to Ms. Giles's testimony, the Defendant has not established that trial counsel's failure to object to the prosecutor's summary of Ms. Turner's testimony was not tactical. *See State v. Smith*, 24 S.W.3d 274, 282. As a result, the Defendant is not entitled to plain error relief.

-18-

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____

ROBERT H. MONTGOMERY, JR., JUDGE