# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 1, 2015


## STATE OF TENNESSEE v. CHRISTOPHER HAMMACK


**Appeal from the Circuit Court for Wayne County**
**No. 15484    Stella L. Hargrove, Judge**

_____


**No. M2015-00898-CCA-R3-CD – Filed March 31, 2016**

_____


Christopher Hammack ("the Defendant") was indicted for one count of initiation of the process to manufacture methamphetamine (Count 1), one count of possession of a firearm during the commission of or attempt to commit a dangerous felony (Count 2), and one count of convicted felon in possession of a firearm (Count 3). The Defendant was convicted by a jury of the lesser included offense of facilitation of initiation of the process to manufacture methamphetamine in Count 1 and as charged in Count 2. A judgment of conviction was entered by the trial court in Count 3. On appeal, the Defendant challenges the sufficiency of the evidence underlying his convictions in Counts 1 and 2. Upon review, we conclude that there was insufficient evidence to support the Defendant's convictions for Counts 1 and 2. Additionally, we conclude that the Defendant did not effectively waive his right to a jury trial or enter a plea of guilty in Count 3. The judgments of the trial court are reversed and the charges are dismissed.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Dismissed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Chadwick G. Hunt, Savannah, Tennessee, for the appellant, Christopher Hammack.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Brent Cooper, District Attorney General; and Beverly White, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

At trial, Investigator Chris Littrell testified that, at the time of the offense, he was employed with the Waynesboro Police Department. Investigator Littrell attended the Methamphetamine Task Force School and received training from the Clandestine Laboratory Investigations Certificate Program. He also received a Tennessee Methamphetamine Pharmaceutical Take Force Certificate of Training. On February 26, 2014, Investigator Littrell, along with several other officers, went to the home of Jason McClain to execute a search warrant for guns and methamphetamine. Investigator Littrell's investigation also indicated that the Defendant "was involved with Mr. McClain." The affidavit supporting the search warrant, which was admitted into evidence without objection, indicates that the Defendant had assisted Mr. McClain in selling guns on two occasions. It is not clear from the affidavit whether the Defendant actually sold the guns in question or whether he assisted in negotiating the terms of the transactions.

When the officers arrived at the residence, they knocked on all of the doors to the home and identified themselves as police.[1] The officers knocked for approximately fifteen to twenty minutes, but no one answered. Eventually, Sheriff Ric Wilson told Investigator Littrell that he saw a "big pit bull" standing in the living room and that he could see a person inside the home. Investigator Littrell joined Sheriff Wilson on the porch and saw the Defendant, whom he later identified in the courtroom, standing inside the house. Investigator Littrell "hollered" at the Defendant and advised him that he had a search warrant for the house, and asked the Defendant to secure the dog in another room so that police could enter the residence. The Defendant secured the dog and opened the door for the officers.

Investigator Littrell entered the house through the living room and saw several guns in plain view, including two or three rifles that were lying on the bed in the bedroom. Investigator Littrell noted that the bedroom door was open when officers entered the house. An unloaded pistol was found in a black, plastic gun case hanging from the dining room door. During their search, officers found six guns inside the house—the pistol in the dining room and five rifles in the bedroom. Investigator Littrell also found ammunition, but the ammunition did not fit the weapons recovered during the search.

---

[1] Investigator Littrell noted that officers were posted at the front, rear, and side doors of the home.

Investigator Littrell and other officers also searched an unlocked shed in the backyard. When they entered the shed, they could smell a strong odor and immediately exited the building. After putting on a safety suit, gas mask, and gloves, Investigator Littrell and another investigator reentered the shed, and found "the leftovers of meth manufacturing." During the search of the shed, the officers found seven one-pot methamphetamine labs of various sizes; three gas generators;[2] five gallons of "sludge" from the generators; several containers of Coleman fuel; bags containing approximately forty ounces of ammonia nitrate; two containers of salt; approximately three dozen coffee filters; three pairs of rubber gloves; seventeen two-quart bags; twelve lithium batteries; 2.4 grams of pseudoephedrine; one blue funnel; various tubing; two syringes with methamphetamine residue; aluminum foil; and propane. Investigator Littrell explained that, to make methamphetamine, one crushes pseudoephedrine pills and places them into a bottle with Coleman fuel, a little bit of water, and the strip from a lithium battery and allows it to "cook." An attached tube helps control the pressure inside the bottle. After the cooking process is complete, the mixture is poured through a coffee filter to drain the "sludge," and the resulting solid substance is methamphetamine. It can be ingested by smoking it through a homemade pipe or by melting the drug in aluminum foil, placing it in a syringe, and injecting it. Investigator Littrell performed a field test on some of the residue found in the tubing, and it tested positive for methamphetamine. Investigator Littrell estimated that the methamphetamine lab "was over a couple of days old[.]"

Based on the evidence found during the search, Investigator Littrell arrested the Defendant for initiation of the process to manufacture methamphetamine and possession of a firearm during the commission of a dangerous felony. Investigator Littrell noted that he did not see the Defendant with a firearm in his hand and that his firearm charge was based on the Defendant's constructive possession. The Defendant admitted to officers that he knew methamphetamine was being made in the shed and that he had smoked methamphetamine that day, but he said he had "no idea" where the firearms came from.

On cross-examination, Investigator Littrell noted that the guns were not tested for fingerprints. Additionally, Investigator Littrell confirmed that the Defendant did not live at Mr. McClain's residence. Investigator Littrell also stated that he saw the Defendant standing "about in the middle of the living room" and that he did not see the Defendant go into any other room in the house. Investigator Littrell confirmed that the Defendant could not reach any of the guns from where he was in the living room and that the Defendant did not try to access the guns while the officers were in the house. Investigator Littrell also stated that there were no items associated with a meth lab found inside the residence and that, other than the Defendant's statement that he knew there was

---

[2] Investigator Littrell explained that the term "generator," as used in the context of manufacturing methamphetamine, refers to a second bottle that is connected to the bottle lab by way of a hose and helps control the pressure created by fumes given off during the cooking process.

a methamphetamine lab in the shed, there was no proof that the Defendant had ever been inside the shed. Investigator Littrell admitted that there was no proof that the Defendant had been present at Mr. McClain's residence in the two days prior to officer's searching the home. Investigator Littrell also acknowledged that the Defendant's smoking methamphetamine did not mean he had initiated the manufacturing process of the drug. On redirect examination, Investigator Littrell reiterated that the Defendant was the only person present in the home and that officers were knocking on the doors to the residence for fifteen or twenty minutes before the Defendant answered the door. Investigator Littrell did not know whether the Defendant was in other rooms in the house while the officers were knocking on the doors.

Officer Gerald Baer testified that he assisted in the execution of the search warrant at Mr. McClain's residence. Officer Baer heard a "good size[d]" dog barking inside the house. Eventually, the Defendant opened the door to the house. Officer Baer stayed in the living room with the Defendant while the search was conducted. He asked the Defendant why he was at Mr. McClain's house, and the Defendant said he had come there to take a shower. However, Officer Baer recalled that the Defendant looked "like he just came there, you know, normal," not like he had taken a shower. Officer Baer noted that the Defendant was the only person inside Mr. McClain's home when the officers arrived. Additionally, Officer Baer had attempted to find the Defendant earlier in the day by going to the Defendant's parents' home. The Defendant's parents told Officer Baer that the Defendant was at Mr. McClain's house.

Investigator Charlie Mosley testified that he was the Senior Meth Tech for the Wayne County Sheriff's Office. On February 26, 2014, Investigator Mosley assisted in the search of a suspected methamphetamine lab at Mr. McClain's residence. When Investigator Mosley arrived, he saw several guns sitting on the bed and one gun in the dining room. Investigator Mosley also helped catalog the evidence found in the shed. Additionally, based on his experience with methamphetamine investigations, Investigator Mosley defined "initiation of the process to manufacture methamphetamine" as taking the individual ingredients out of their packages and combining them in the "shake bottle" to cook methamphetamine.

On cross-examination, Investigator Mosley said he could not recall whether the items found in the shed were tested for fingerprints. Investigator Mosley also acknowledged that the Defendant was inside Mr. McClain's residence the entire time Investigator Mosley was there. Additionally, he noted that he only saw the Defendant in the living room and that the guns were found in other rooms inside the home.

James Hammack, the Defendant's father, testified that the Defendant lived with Mr. Hammack and his wife. Mr. Hammack recalled that, on February 26, 2014, he and the Defendant got haircuts, went to the store, and then went to McDonald's for hot fudge

sundaes. Around 3:30 or 4:00 p.m., Mr. Hammack drove the Defendant to Mr. McClain's house. Mr. Hammack stated that he did not see anyone else at the house but that the front door was open. Mr. Hammack noted that the Defendant relied on Mr. and Mrs. Hammack for transportation, and Mr. Hammack was not aware of the Defendant's going anywhere in the two and one half weeks prior to his arrest. Mr. Hammack recalled that the Defendant would walk a quarter of a mile to Mr. Hammack's neighbor's house about three times a day but that, other than those trips, the Defendant was at Mr. Hammack's house.

On cross-examination, Mr. Hammack maintained that the Defendant had stayed at his home every day for the two weeks prior to his arrest. The day before the Defendant was arrested, "Sergeant Gray" and "Chris Ollie" came to Mr. Hammack's house to visit the Defendant, and the Defendant spoke with Mr. Ollie on the front porch. Mr. Hammack said he and the Defendant went to McDonald's and to the store to buy milk "[j]ust about every single day," but Mr. Hammack insisted that he remembered the days of February 25 and 26, 2014, "very well."

After deliberation, the jury found the Defendant guilty of facilitation of initiation of the process to manufacture methamphetamine in Count 1 and possession of a firearm during the commission of or attempt to commit a dangerous felony in Count 2. Count 3 was not presented to the jury for deliberation. While the jury was deliberating on Counts 1 and 2, the following exchange occurred:

THE COURT: I'm just going to talk a little bit about that Count [3]. A little bit different trial, in that, if the jury were to return a verdict of guilty of that Count [2], then we would go further on Count [3], and we would actually put on proof, if need be.

Often I equate this to D.U.I. trials with subsequent offenses, second and third or greater. Often, the lawyers will agree that that's not necessary. Do you all have any agreement there?

[THE STATE]: We haven't thought about that, Judge.

THE COURT: Do you want to talk and see if you can stipulate that, indeed, he does have a prior felony conviction?

[DEFENSE COUNSEL]: I think we can stipulate—

THE COURT: Okay.

[DEFENSE COUNSEL]: —if they find—find him guilty on [Count 2]—

- 5 -

THE COURT: Okay.

[DEFENSE COUNSEL]: —then he does have a—a prior felony.

THE COURT: All right. Well, that would be good and I guess I would [send] back the Verdict Form then, for them to set the fine. I would still have to do that, wouldn't I?

[DEFENSE COUNSEL]: Yes.

* * *

[THE STATE]: Did you send Count [3] back [to the jury]?

THE COURT: No, I did not send Count [3] back yet, but we will if we need to. Depending on what they do, do you all think we could—what do you think about Count [3] on the fine, assuming that we have to address this? I hate to send them back out. Do you think maybe, you all could agree on something there or submit it to the Court, [defense counsel]?

[THE STATE]: Judge, I think we are in agreement not to do a fine on Count [3], just to put a zero on it.

THE COURT: Okay, if we come to that.

[THE STATE]: If we come to that.

THE COURT: I just like to know that, so I can tell them whether they can leave or something. [Defense counsel], are you okay with that?

[DEFENSE COUNSEL]: Yes, your honor.

After the jury returned with their verdict, the trial court accepted the jury's verdict and the following exchange occurred:

THE COURT: Let's be clear on Count [3], though, let's be clear on the record that that's been stipulated that, indeed, [the Defendant] has a prior felony conviction. And let's put that in the record, then, the certified copy of that.

[THE STATE]: Judge, let me be on the record that I am putting a certified copy of Wayne County Case Number 4912, Count [1], that [the Defendant] pled guilty to the Promotion of Methamphetamine of the 7th day—excuse

me, the 8th day of July 2010, and it is a true and exact copy, certified October 8, 2014, by [the circuit court clerk].

* * *

THE COURT: Okay, we will just make it a part of the record now and make sure that it becomes filed. And we've also agreed, on that particular charge, to not assess a fine.

[DEFENSE COUNSEL]: That's correct.

THE COURT: Okay. And then everything else will be reserved until sentencing, okay. All right, so I guess, technically, there would be a finding of guilty on Count [3] by stipulation with no fine.

The Defendant did not speak at any time during the discussion about Count 3, and there is nothing in the record indicating that defense counsel and the Defendant discussed waiving the right to have the jury determine Defendant's guilt in Count 3.

Subsequently, the Defendant appeared in court and personally waived his right to a sentencing hearing. The trial court found that the Defendant knowingly and intelligently waived his right to a sentencing hearing and accepted the agreed-upon sentence. The trial court sentenced the Defendant to four years in Count 1, five years in Count 2, and three years in Count 3. The sentences in Counts 2 and 3 were ordered to run concurrently with each other and consecutively to the sentence in Count 1, for an effective nine-year sentence. This timely appeal followed.

## II. Analysis

*Sufficiency of the Evidence*

On appeal, the Defendant challenges the sufficiency of the evidence underlying his convictions for facilitation of initiation of the process to manufacture methamphetamine in Count 1 and possession of a firearm during the commission or attempt to commit a dangerous felony in Count 2. Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon

direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

### a. Facilitation of Initiation of the Process to Manufacture Methamphetamine (Count 1)

The Defendant contends that the evidence is insufficient to support his conviction for facilitation of initiation of the process to manufacture methamphetamine because, based on the proof at trial, no rational trier of fact could have found that the Defendant knowingly furnished substantial assistance in the initiation of the process to manufacture methamphetamine. The State argues that the evidence was sufficient because, prior to executing the search warrant at Mr. McClain's home, Investigator Littrell had information that the Defendant was involved with Mr. McClain; the Defendant was the only person present on the property during the officers' search; and the Defendant acknowledged that he was aware of the methamphetamine laboratory in the shed.

"It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." Tenn. Code Ann. § 39-17-435(a) (2010). "Initiate" means "to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." Tenn. Code Ann. § 39-17-435(c) (2010). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intended to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2010). The Sentencing Commission Comments to section 39-11-403 state that the facilitation statute applies when a person participates substantially in a felony but "lacks the intent to promote or assist in, or benefit from, the felony's commission." Tenn. Code Ann. § 39-11-403, Sentencing Comm'n Cmts; State v. Flemming, 19 S.W.3d 195, 199 (Tenn. 2000).

In this case, there was not sufficient evidence to show that the Defendant "furnishe[d] substantial assistance" in initiating the process to manufacture

methamphetamine.  See Tenn. Code Ann. § 39-11-403(a) (2010).  The Defendant was discovered, alone, inside Mr. McClain's house.  All of the evidence related to methamphetamine production was discovered in a separate shed located on the property, and the police testified that the lab appeared to be two days old.  There was no evidence that the Defendant ever entered the shed or that the Defendant was present at Mr. McClain's house when the lab was active.  The only evidence presented purportedly linking the Defendant to the methamphetamine lab was that the Defendant was "involved with Mr. McClain[;]" the Defendant admitted that he knew a lab was in the shed; and that he had taken methamphetamine earlier that day.  Such evidence is not sufficient to establish that the Defendant furnished substantial assistance in the initiation of the process to manufacture methamphetamine.  Accordingly, we dismiss this conviction.

b. Possession of a Firearm During the Commission of a Dangerous Felony (Count 2)

The Defendant also argues that there was insufficient evidence to support his conviction for possession of a firearm during the commission of a dangerous felony because the guns were found in rooms in which the Defendant was not located and that the Defendant did not have access to the guns.  Additionally, the Defendant contends that, while initiating the process to manufacture methamphetamine is defined as a dangerous felony under Tennessee Code Annotated section 39-17-1324, facilitation of that offense is not included as a dangerous felony.  However, we need not address either of the Defendant's arguments because we conclude there was insufficient evidence to support the conviction because the evidence did not establish that the Defendant committed any underlying dangerous felony.

"It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony."  Tenn. Code Ann. § 39-17-1324(a) (Supp. 2013).  Initiation of the process to manufacture methamphetamine constitutes a dangerous felony for the purposes of this offense.  Tenn. Code Ann. § 39-17-1324(i)(1)(K) (Supp. 2013).

As noted above, the evidence is not sufficient to establish that the Defendant initiated the process to manufacture methamphetamine or facilitated in the initiation of the manufacturing process.  As such, the State has failed to prove the underlying dangerous felony to support a conviction for possession of a firearm during the commission or attempt to commit a dangerous felony.  The evidence was insufficient to support the Defendant's conviction for this offense, and the conviction is dismissed.

*Waiver of Right to a Jury Trial in Count 3*

The Defendant does not address his conviction for felon in possession of a firearm in his brief, and the only reference to Count 3 in the State's brief is the statement: "The

evidence was also sufficient to support the two firearms convictions." However, we find it necessary to address in this opinion the Defendant's waiver, or lack thereof, of his right to a trial by jury on Count 3 and the failure to have either a trial before the trial court after the waiver or a guilty plea entered by the Defendant. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal").

"[I]t is the prerogative of every criminal defendant to waive his right to a trial by jury." State v. Bobo, 814 S.W.2d 353, 359 (Tenn. 1991). However, waiver of the right to a jury trial must be made "in accordance with the safeguards provided by the constitution and implementing statutes or rules of criminal procedure." Id. (citing State v. Durso, 645 S.W.2d 753, 758 (Tenn. Crim. App. 1983)). Rule 23 of the Tennessee Rules of Criminal Procedure requires that a defendant's waiver of a jury trial be made in writing, with the consent of the district attorney general, and with the approval of the court. Absent compliance with Rule 23, "the record should clearly show a voluntary relinquishment of the rights to be tried by a common law jury." Bobo, 814 S.W.2d at 359. Waiver cannot be found when the record is silent on the issue, and defense counsel may not waive the right to a jury trial for the defendant. State v. Ellis, 953 S.W.2d 216, 221 (Tenn. Crim. App. 1997). Instead, "in order for a criminal defendant to effectively waive his right to a jury trial, he must first be advised by the court of his right to a jury trial, and then, must *personally* waive the right in open court for the record." Id. at 221-22 (emphasis in original). In order to ensure that a defendant waives the right voluntarily, knowingly, and intelligently, the "preferred practice" is "for the trial court to advise the defendant of his right to a trial by jury, the nature of the right, and the consequences of waiving it." Id. at 222.

In this case, the record does not contain a written waiver of a jury trial for Count 3 signed by the Defendant or an oral waiver made by the Defendant in open court on the record. The record does not reflect that defense counsel discussed with the Defendant waiving the Defendant's right to have Count 3 decided by the jury before agreeing to stipulate that the Defendant had a prior felony conviction for the purposes of Count 3. Defense counsel could not waive the right to a jury trial on Count 3 for the Defendant. Additionally, there was no guilty plea during which the Defendant was advised of his rights, waived those rights, and acknowledged guilt. There was only a "finding of guilty on Count [3] by stipulation." Thus, we are unable to conclude that the Defendant voluntarily relinquished his right to be tried by the jury that had been sworn to determine his guilt or innocence.

The Double Jeopardy Clause of the Fifth Amendment provides that no "person shall be subject for the same offense to be twice put in jeopardy of life or limb." U. S.

Const. amend V. Article I, section 10 of the Constitution of Tennessee states "[t]hat no person shall, for the same offense, be twice put in jeopardy of life and limb." "Jeopardy attaches in a jury case when a defendant is put to trial before a court of competent jurisdiction, upon sufficient indictment[,] and the jury is impaneled and sworn." State v. Todd, 654 S.W.2d 379, 382 (Tenn. 1983) (citing Etter v. State, 205 S.W.2d 1, 3 (Tenn. 1947)). "Once jeopardy attaches, a defendant has a valued interest in having the particular jury selected for trial render a verdict." State v. Huskey, 66 S.W.3d 905, 914 (Tenn. Crim. App. 2001) (citing United States v. Jorn, 400 U.S. 470, 485-86 (1971)). Generally, once jeopardy has attached, double jeopardy will bar a retrial unless a defendant assents to the trial court's ending the proceedings or manifest necessity exists for the trial court to declare a mistrial. State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). Because the jury was impaneled and sworn in this case, and because none of the exceptions to double jeopardy are present, the state and federal double jeopardy prohibitions precludes retrial of Count 3. The judgment of conviction for Count 3 must be reversed and dismissed.

## III. Conclusion

For the aforementioned reasons, the judgments of the trial court are reversed and the charges are dismissed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE